170 F.3d 349
 AMERICAN BUREAU OF SHIPPING, Plaintiff-Appellant-Cross-Appellee,
v.
TENCARA SHIPYARD S.P.A., Defendant-Appellee-Cross-Appellant,
Societe Jet Flint, S.A. et al., Defendants-Appellees.
 Nos. 98-7823(L), 98-7893(XAP).
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 25, 1999.
Decided March 17, 1999.
 
 ROBERT A. MILANA, Kirlin, Campell & Keating, New York, N.Y. (Michael D. Wilson & Richard H. Brown, Jr., on the brief) for Plaintiff-Appellant-Cross-Appellee.
 TULIO R. PRIETO, Cardillo & Corbett, New York, NY, for Defendant-Appellee-Cross-Appellant.
 JOSEPH G. GRASSO, Thacher Proffit & Wood, New York, NY, for Defendants-Appellants.
 Before: NEWMAN, WALKER, and CALABRESI, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 Plaintiff-Appellant-Cross-Appellee American Bureau of Shipping ("ABS") appeals from a judgment entered on May 26, 1998, in the United States District Court for the Southern District of New York (Harold Baer, Jr., Judge ). Defendant-Appellee-Cross-Appellant Tencara Shipyard S.P.A. ("Tencara") cross-appeals from the same judgment. The district court granted ABS's motion to compel arbitration against Tencara but denied the same motion against the defendant owners and underwriters of the racing yacht "Tag Heuer." We agree with the district court's holding that Tencara is bound to arbitrate its claims against ABS. But we disagree with the court's conclusion that the yacht owners and underwriters are not required to arbitrate with ABS. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.
 
 BACKGROUND
 
 2
 In 1992, Titouan Lamazou and a group of investors (the "Owners") entered into a construction contract with Tencara-an Italian shipyard-to build a racing yacht that would eventually be named the "Tag Heuer." The Owners wanted a ship that could "circumnavigate the globe is less than 80 days, in competition for the Jules Verne Trophy." The construction contract between Tencara and the Owners specified that (1) the Owners would be solely responsible for registering the vessel under the French flag, (2) the Owners would provide all necessary assistance to Tencara to ensure that the yacht met with the approval of the French authorities, and (3) the ship would be "classed" according "[t]o the quality standards and norms permitting approval of ... the American Bureau of Shipping, Genoa Office."
 
 
 3
 "Classification" is a term of art in maritime contract law. It refers to the process by which a ship is inspected to make sure it is seaworthy and complies with various safety regulations. "Contracts for vessel certification and classification are unique to the realm of admiralty; these inspections and resulting certificates are required either legally or practically before a shipowner may ply navigable waters." Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1081 (2d Cir.1993).
 
 
 4
 To obtain a ship classification, one goes to a classification society. ABS is one of the world's leading classification societies. As we have stated:
 
 
 5
 A classification society such as ABS develops rules, guides, standards, and other criteria for the design and construction of ships. When requested, a society reviews the design and surveys a ship before, during, and after construction to verify compliance with the relevant international safety conventions and applicable rules of the classification society.
 
 
 6
 Id. at 1078.
 
 
 7
 Vessel classifications provide two major benefits for shipowners. First, insurance is much less expensive for classed ships than for non-classed ships. Second, many governments-the French authorities in this case--require a vessel classification before they will allow a craft to sail under their national flag.
 
 
 8
 To obtain an ABS classification for the "Tag Heuer," Tencara entered into a contract with ABS in March 1992 (the "Request for Class Agreement"). This agreement specified that all disputes arising thereunder were to be arbitrated in New York. The Owners received a copy of the Request for Class Agreement from Tencara in May 1992. The coverage that the Owners obtained on the "Tag Heuer" from a variety of insurers (the "Underwriters") was premised on the existence of a valid classification. While the yacht was under construction throughout 1992, however, the Owners had only limited contact with ABS, and Tencara handled virtually all matters related to shipbuilding and classification.
 
 
 9
 In February 1993, the yacht was completed and delivered by Tencara to the Owners. At that time, ABS delivered an Interim Certificate of Classification ("ICC") to Tencara pursuant to the Request for Class Agreement. Tencara, in turn, gave the ICC to the Owners. The ICC explicitly incorporated by reference the "terms and conditions" of the Request for Class Agreement, including that agreement's arbitration clause.
 
 
 10
 A few months after the "Tag Heuer" was delivered to the Owners, the yacht suffered serious hull damage during a cruise to Venice. A survey indicated that the craft's damage had been the product of a defective design and of poor construction. As a result, the Underwriters indemnified the Owners pursuant to their insurance policies. Tencara subsequently sued ABS in Italy, while the Owners and the Underwriters each filed independent claims against ABS in France.
 
 
 11
 ABS then brought this action, seeking to compel Tencara, the Owners, and the Underwriters to arbitrate their claims pursuant to the Request for Class Agreement, both in itself and as it was incorporated in the ICC. The district court held that Tencara was required to arbitrate with ABS, because Tencara was acting on its own behalf in signing the Request for Class Agreement rather than as an agent of a disclosed principal--the Owners. The court, however, rejected ABS's argument that the Owners and the Underwriters were bound to arbitrate with ABS due to the Owners' acceptance of the ICC from ABS. Specifically, the district court held (1) that acceptance of the ICC did not give rise to a contract between the Owners and ABS, and (2) that the Owners were not estopped from denying the obligations of the ICC, as any benefits that they had received from the ICC were only "indirect."[1]
 
 DISCUSSION
 
 12
 Subject-matter jurisdiction in this suit is grounded in admiralty. See 28 U.S.C. § 1333 (1994).[2] We review the district court's conclusion as to the existence of an arbitration agreement for clear error. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir.1987) (stating that the district's court's determination that there was an arbitration agreement is a factual finding and citing Fed.R.Civ.P. 52(a), which enunciates the "clear error" standard of review for factual findings, though legal rulings concerning which entities are bound are reviewed de novo ).
 
 
 13
 Our first task is to determine whether the Owners of the "Tag Heuer" can be bound to arbitrate with ABS even though they never signed the arbitration agreement. We have stated that non-signatories may be bound by arbitration agreements entered into by others. See Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir.1995). This can occur pursuant to five different theories: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. See id. Because it proves to be sufficient, we focus exclusively on the estoppel theory.[3]
 
 
 14
 As an initial matter, the Owners assert that--since they were never in privity with ABS--we lack personal jurisdiction over them and cannot consider ABS's estoppel argument. This contention is without merit. It is well-settled that federal courts applying New York law have personal jurisdiction over parties that agree to arbitrate their disputes in New York. See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos, 553 F.2d 842, 844 (2d Cir.1977). The Owners construe this to mean that personal jurisdiction exists only when there is an express arbitration agreement between the parties. But if the Owners are estopped from denying their obligations under the arbitration agreement between Tencara and ABS, it follows that they are also estopped from asserting a lack of personal jurisdiction based on that agreement. There is no good reason to read the equitable theory of estoppel to allow the defense of "no personal jurisdiction" while barring the defense of "no duty to arbitrate." With the owners estopped from denying personal jurisdiction, the law regards such jurisdiction as established in litigation between these parties.
 
 
 15
 We therefore turn to the merits of ABS's estoppel argument. A party is estopped from denying its obligation to arbitrate when it receives a "direct benefit" from a contract containing an arbitration clause. See Thomson-CSF, 64 F.3d at 778-79. ABS argues that the Owners received several direct benefits from the ICC, which incorporated the Request for Class Agreement's arbitration clause by reference. We agree with ABS that the Owners received such benefits, including (1) significantly lower insurance rates on the "Tag Heuer," and (2) the ability to sail under the French flag. In reaching the conclusion that the Owners had only received an indirect benefit from the ICC, the district court relied heavily on the erroneous assumption that it was Tencara's rather than the Owners' responsibility to register the vessel under the French flag. Whatever the situation might have been under the district court's incorrect assumption, it is patent that on the actual facts the Owners received direct benefits from the ICC. Without the ICC, registration would have been practically impossible. The Owners are hence required to arbitrate their claims against ABS.
 
 
 16
 We next confront the issue of whether the yacht's Underwriters can also be compelled to arbitrate with ABS. It is clearly established that "an insurer-subrogee stands in the shoes of its insured." See Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir.1992). Accordingly, ABS's motion to compel arbitration against the insured Owners is equally valid against the insurer Underwriters, and we therefore hold that the Underwriters of the "Tag Heuer" must also submit to arbitration with ABS.[4]
 
 
 17
 Finally, we address the cross-appeal of Tencara. Tencara's position is that it was acting solely as the Owners' agent when it signed the Request for Class Agreement, and that, as the agent of a disclosed principal, it cannot be bound by that agreement's arbitration clause. See Restatement (Second) of Agency § 320 (1958). We review a determination of an agency relationship de novo. See Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1, 7-9 (2d Cir.1978). There is no merit in Tencara's argument, which is based on the mistaken notion that a party must be either solely a principal or solely an agent. See Restatement (Second) of Agency § 328 cmt. b ("In many cases the agent is a party to the contract made by him on behalf of a disclosed principal and, as such, is responsible for its performance."). The shipyard clearly acted, at least in part, on its own behalf when it contracted with ABS for classification services. It itself derived the benefit of fulfilling its ship construction contract with the Owners by hiring ABS in the Request for Class Agreement. And the record shows no exercise of control by the Owners over Tencara sufficient to negate Tencara's role as, at least, one of the principals. As a result, we affirm the district court's conclusion that Tencara must arbitrate its claims with ABS.
 
 
 18
 The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Because, in the court's view, the Underwriters' obligations depended on the existence of Owner obligations, this holding also freed the Underwriters from any duty to arbitrate
 
 
 [2]
 The district court found jurisdiction on the basis of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, see 9 U.S.C. §§ 201, 203 (Supp.1998), since "[t]he defendants all reside in Italy, France, or Great Britain," all signatories to the Convention. In view of the presence in the suit of various Lloyd's of London syndicates, and assuming arguendo that residence in a signatory state is necessary for jurisdiction to lie, that basis of jurisdiction may be problematic as to some defendants. Cf. E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925, 928-29 (2d Cir.1998) (describing the structure of Lloyd's and pointing out that syndicates are comprised of thousands of individual underwriters whose identity (and residence) is not disclosed). But since jurisdiction was also claimed, and undoubtedly exists, in admiralty as to all the parties, we need not consider further the perplexities engendered by the presence of the Lloyd's syndicates. See Advani Enter., Inc. v. Underwriters at Lloyds, 140 F.3d 157, 161 (2d Cir.1998) (permitting suit to proceed in admiralty where unknown citizenships of the Lloyd's Underwriters placed diversity jurisdiction in doubt)
 
 
 [3]
 Accordingly, we express no view on the question of whether the Owners and ABS also came into privity upon the Owners' acceptance of the ICC
 
 
 [4]
 The Underwriters counter that the French court hearing their suit against ABS will not recognize the arbitration of the Underwriters' claims because "[u]nder French law, Underwriters are entitled to pursue these claims whether or not they have obtained a subrogation agreement from the Owners." We express no view as to the possible effect under French law of this judgment or of a subsequent arbitration award. Under American law, the Underwriters are clearly required to arbitrate, and that is the only issue before us today