United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 9, 2003**

Charles R. Fulbruge III
Clerk

Revised September 12, 2003

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-20929

_____

BRIDAS SAPIC; BRIDAS ENERGY
INTERNATIONAL, LTD; INTERCONTINENTAL
OIL & GAS VENTURES, LTD.; BRIDAS
CORPORATION,

                                        Plaintiffs-Appellees,

                v.

GOVERNMENT OF TURKMENISTAN; ET AL.,

                                        Defendants,

GOVERNMENT OF TURKMENISTAN; STATE
CONCERN TURKMENNEFT,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before DAVIS and BENAVIDES, Circuit Judges, and RESTANI[*],
District Judge.

BENAVIDES, Circuit Judge:

I.

    Plaintiffs-appellees, Bridas S.A.P.I.C., Bridas Energy

_____

    [*]Judge, U.S. Court of International Trade, sitting by
designation.

-1-

International, Ltd., Intercontinental Oil & Gas Ventures, Ltd., and Bridas Corporation (collectively, "Bridas") originally brought this action to confirm an international arbitration award rendered in Bridas's favor against Defendants-appellants, Government of Turkmenistan ("the Government" or "Turkmenistan"), Concern Balkannebitgaz-Senegat, and State Concern Turkmenneft (collectively "Turkmenneft").

Bridas, an Argentinian corporation, entered into a joint venture agreement ("JVA" or "the agreement") on February 10, 1993, with a production association, Turkmenneft, formed and owned by the Government at the time that the JVA was signed. The Government itself was not a signatory to the agreement. The JVA designated Bridas as the "Foreign Party," and Turkmenneft as the "Turkmenian Party." Over time, the Government substituted various other entities to serve as the Turkmenian Party, ultimately resting with State Concern Turkmenneft and Concern Balkannebitgaz-Senegat (collectively, "Turkmenneft").

The JVA created a joint venture entity called Joint Venture Keimir ("JVK"). JVK was established "for the purpose of conducting hydrocarbon operations in an area in southwestern Turkmenistan, known generally as Keimir." The relevant part of Article XXIV of the agreement stipulates that "[a]ny dispute, controversy or claim arising out of or in relation to or in connection with th[e] [a]greement...shall be exclusively and finally settled by arbitration, and any Party may submit such a

dispute, controversy or claim to arbitration." The parties further agreed that any arbitration would be "conducted in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce as amended from time to time." The law governing the interpretation of the agreement was to be the law of England.

Bridas claims that in November 1995, the Government "ordered Bridas to suspend further work in Keimir, and prohibited Bridas from making imports and exports in or from Turkmenistan." Consequently, on April 16, 1996, Bridas initiated an arbitration proceeding against Appellants with the International Chamber of Commerce ("ICC").

On June 21, 1996, Turkmenistan argued to the ICC Court of Arbitration that it was not a proper party to the arbitration because, among other reasons, it did not sign the JVA and was thus not a party to the arbitration clause contained within it. The ICC Court subsequently confirmed by letter that the arbitrators themselves would determine whether the Government was subject to their jurisdiction. The dispute was subsequently referred to a three-person tribunal. Although the arbitration agreement contemplated that the arbitration proceeding would be held in Stockholm, Sweden, the parties instead agreed to arbitration proceedings in Houston, Texas.

The arbitral proceedings, which began in January 1997, involved 19 days of hearings, various expert reports, testimony

concerning damages, and extensive legal briefing.  On June 25, 1999, a two-person majority of the Tribunal issued its First Partial Award ("FPA").  The FPA held that (1) the arbitrators had jurisdiction to determine whether they had jurisdiction over the Government, and (2) that "the Government [was] a proper party to the arbitration."  The Tribunal also ruled that Appellants had repudiated the JVA.  The FPA stated:

> [I]f [Bridas] were to accept repudiatory conduct by the [Defendants] and [Turkmenistan] and thus to bring the [joint venture] [a]greement to an end, their damages would be calculated on a loss-of-bargain basis, involving 218,560,935 barrels of oil equivalent at a net-back price of $10.50 per barrel, using a discount rate of 10.446% based on a contract term of 25 years.

In a letter dated July 5, 1999, Bridas formally accepted the Defendant's repudiation of the JVA.

On October 21, 1999, the arbitrators issued their Second Partial Award ("SPA").  In its SPA, the same two-person majority held that the Tribunal had "the jurisdiction to consider and make an award concerning [Bridas's] claim for damages arising out of their acceptance of the repudiatory conduct of the [appellants]."

The Third Partial Award ("TPA") was rendered on September 2, 2000.  In the TPA, the same two-person majority clarified its previous rulings in the FPA and calculated damages for Bridas. The majority held that the 10.446% discount rate was the appropriate rate for calculating damages because "[i]t was higher than the non-risk [7.5%] discount factor advanced initially by

-4-

[Bridas] and takes into account the various risk referred to by the parties in the evidence." The Tribunal then awarded a grand total of $495,000,000 in damages to Bridas. The Final Award was issued on January 26, 2001.

Bridas initiated this lawsuit on July 7, 1999, when it filed its application for confirmation of the FPA.[1] The Government and Turkmenneft, in response, filed motions to dismiss the application for confirmation and to vacate and refuse confirmation of the FPA. On December 22, 2000, Turkmenneft, conditionally joined by the Government, moved to vacate or modify both the TPA and the Final Award.

The district court denied Appellants' motions to vacate or modify the FPA, TPA, and the Final Award.[2] The Government and Turkmenneft appealed the district court's judgment to this court.

Appellants ask us to resolve the following issues on appeal: (1) whether the Tribunal had jurisdiction over the Government; (2) whether the arbitral majority's rulings on the merits were in manifest disregard of the law; and (3) whether the arbitral majority exceeded its authority in calculating the damage award.

---

[1] Bridas subsequently withdrew its motion to confirm the FPA.

[2] Bridas withdrew its motion to confirm the FPA in February 2000. Appellants' motions to dismiss the application for confirmation thus became moot. The only motions that remained before the district court, therefore, were Appellants' motions to vacate or modify the FPA, TPA, and Final Award. The district court, therefore, erred in ordering "the arbitration awards in the case...CONFIRMED."

II.

United States federal courts have jurisdiction to hear this case under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* We have jurisdiction to hear this appeal under § 16(a)(3) of the Act. 9 U.S.C. § 16(a)(3) *et seq.* (permitting appeal of "a final decision with respect to an arbitration that is subject to this title.").

*A.*

The first issue we address is whether the Tribunal properly exercised jurisdiction over the Government. In reviewing a district court's refusal to vacate an arbitration award on the ground that one of the parties never agreed to arbitrate the dispute, the district court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo*. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947-48 (1995). The district court's interpretation of the arbitration agreement, and whether it bound the parties to arbitrate, is a question of law. *R.M. Perez & Assoc., Inc. v. Welch,* 960 F.2d 534, 537 (5th Cir. 1992). *See MS Dealer Service Corp., v. Franklin,* 177 F.3d 942, 946 (11th Cir. 1999) (noting that a district court's denial of a petition to compel arbitration on the ground that a party was not a signatory to the contract is reviewed *de novo); Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1513 (10th Cir. 1995) (same). The factual findings upon

which such a determination is based are, of course, subject to review only for clear error. *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC,* 268 F.3d 58, 61 (2d Cir. 2001). The parties agree that federal common law governs the determination of this issue.

*B.*

In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause.[3] Even though the Government did not sign the JVA, the Tribunal held that the Government was bound to arbitrate the dispute with Bridas because (1) the Government had not taken any steps to extricate itself from the proceedings and (2) its evaluation of the evidence revealed at least 22 commitments in the JVA "that only the Government could give or fulfill."

The district court, because it did not find "clear and unmistakable" evidence that the parties agreed that the Tribunal would determine its own jurisdiction, undertook an independent

---

[3]*Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir. 2002)(holding that arbitration agreements "must be in writing and signed by the part[ies]" and may apply to nonsignatories only "in rare circumstances"). *Accord Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir. 2000)(noting that "arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement nonsignatory"). *Cf. EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294 (2002)("Arbitration under the [FAA] is a matter of consent, not coercion"); *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 478 (1989)("[T]he FAA does not require parties to arbitrate when they have not agreed to do so.").

-7-

review of whether the Government was bound to arbitrate with Bridas. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-47 (1995). *Accord AT&T Technologies, Inc. v. Communications Worker,* 475 U.S. 643, 649 (1986). Whether a party is bound by an arbitration agreement is generally considered an issue for the courts, not the arbitrator, "[u]nless the parties clearly and unmistakably provide otherwise."[4] *AT&T Tech.,* 475 U.S. at 649. The district court concluded that despite the Government's non-signatory status, principles of agency and equitable estoppel bound the Government to the JVA.

*C.*

As a preliminary matter, we will address Bridas's assertion that the Government waived its right to contest the Tribunal's

---

[4]This independent review of whether the arbitration panel had jurisdiction over the Government represents a departure from the typically deferential review afforded arbitral decisions pursuant to the federal policy favoring arbitration. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945 (1995). The presumption *in favor* of arbitration concerning the scope of arbitrable issues is not applicable to the question of *who* should decide arbitrability, because the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so. *Id.; Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12 (1967). *See Paine Webber Inc. v. Hartmann,* 921 F.2d 507, 514 (3d Cir. 1990)(stating it is "per se irreparable harm if a court were to abdicate its responsibilities to determine the scope of an arbitrator's jurisdiction and, instead, were to compel a party who has not agreed to do so, to submit to an arbitrator's own determination of his authority."); *Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069 (5th Cir. 2002) (noting that ordinary contract principles, rather than the federal policy favoring arbitration, apply to the determination of whether there is a valid agreement to arbitrate).

jurisdiction because: (1) it failed to challenge the Tribunal's Order No. 5; and (2) it voluntarily took part in the arbitration through Turkmenneft.

Both of these arguments are meritless. Under § 172.082(f) of the Texas International Arbitration Act ("TIAA"), Tex. Civ. Prac. & Rem. Code § 172.082(f) (Vernon 1997 & Supp. 2003), if a tribunal makes a preliminary ruling *that it has jurisdiction* (not that it has jurisdiction to determine jurisdiction), a party waives any objection to the ruling, unless it requests the district court of the county in which the arbitration is taking place to decide the matter. Tex. Civ. Prac. & Rem. Code § 172.082(f). Order No. 5 states: "[w]e have not yet decided whether the Government is bound by the commitment to arbitrate." The order, thus, did not address whether the Tribunal had jurisdiction over the Government. § 172.082(f) of the TIAA is therefore inapplicable.

Second, while it is rare that we are asked to decide a jurisdictional issue such as this one after the proceedings have concluded, neither the fact that the Government "allowed the proceeding to continue" over its objection, nor its "virtual representation" at the arbitration by Turkmenneft, waive its right to dispute the Tribunal's jurisdiction in court. *See, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 946-47 (1995). The cases cited by Bridas to the contrary are

inapposite.

*D.*

We begin our review by considering the terms of the JVA. Who is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement. *See Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 528 (5th Cir. 2000)(noting that whether a party is obligated to arbitrate is a matter of contract); *Smith/Enron Cogeneration Limited Partnership, Inc. v. Smith Cogeneration International, Inc.,* 198 F.3d 88, 95 (2d Cir. 1999) (noting that whether an entity is a party to the arbitration agreement is included within the broader issue of whether the parties agreed to arbitrate); *McCarthy v. Azure,* 22 F.3d 351, 355 (1st Cir. 1994)(noting that federal common law "dovetails precisely with general principles of contract law," and "the judicial task in construing a contract is to give effect to the mutual intentions of the parties") (quoting *NRM Corp. v. Hercules, Inc.,* 758 F.2d 676, 681 (D.C. Cir. 1985)).

It is apparent that the four corners of the agreement do not bind the Government to arbitrate this dispute. The Government did not sign the JVA, nor was it defined as a party in the agreement. The agreement describes the framework for the relationship between two parties: the "Foreign Party," defined as Bridas, and the "Turkmenian Party," defined as Turkmenneft.

-10-

Considering that the purpose of the joint venture was to develop the hydrocarbon resources of a nation whose economy and land is dominated by the Government, the Government itself is not mentioned frequently in the agreement.[5]  Corporations commonly elect to establish "liability insulating entities" to enter into particular types of transactions, and the structure of the JVA indicates that this was exactly what the Government intended to do with respect to the JVA.  *See Westmoreland v. Sadoux,* 299 F.3d 462, 467 (5th Cir. 2002).  The agreement itself does not signal an intention to bind the Government to its terms, and thus to arbitrate this dispute.

*E.*

Nevertheless, federal courts have held that so long as there is *some* written agreement to arbitrate, a third party may be bound to submit to arbitration.  Carolyn B. Lamm & Jocelyn A.

---

[5]**Article 3.29**, defines "[r]egistration" as "the official registration of the Joint Venture as a legal entity by the government of Turkmenistan."  **Article 11.8** provides for the government to receive its royalties from the hydrocarbon production in-kind, subject to the agreement of the parties, and **Article 11.9** permits JVK to exchange its product for product produced by Government-owned refineries.  **Article 22.3** states, "Interests, rights and obligations of Turkmenistan, as represented by Turkmenian Party, and interest, rights and obligations of the Foreign Party under this Agreement, shall be solely governed by the provisions of this Agreement which may be altered or amended only by the mutual written agreement of the Parties to this Agreement....  **Article 27.5** permits JVK to rent property from the Government that may be reasonably necessary for its operations.

Aqua, *Defining the Party – Who is a Proper Party in an International Arbitration Before the American Arbitration Association and Other International Institutions,* 34 Geo. Wash. Int'l L. Rev. 711, 720 (2003).[6]  Ordinary principles of contract and agency law may be called upon to bind a nonsignatory to an agreement whose terms have not clearly done so.  *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc,* 269 F.3d 187 (3d Cir. 2001); *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995).  Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary.  *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995); *DuPont,* 269 F.3d at 195-97 (3d Cir. 2001) .  *Accord Javitch v. First Union Securities, Inc.,* 315 F.3d 619, 629 (6th Cir. 2003).  Bridas has waived arguments premised upon assumption and incorporation by reference.[7]  We address the remaining four

---

[6]*See International Paper Co. v. Schwabedissn Maschinen & Anlagen GMBH,* 206 F.3d 411, 416-17 (4th Cir. 2000); *Thomson-C.S.F., S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995); *Alamria v. Telcor Int'l, Inc.,* 920 F. Supp. 658, 669 (D. Md. 1996)(finding "there is no strict requirement that only signatories to an agreement be susceptible to compelled arbitration).

[7]Bridas did not appeal the district court's holding that Turkmenistan did not assume the obligation to arbitrate.  Bridas attempted to appeal, in a footnote, the district court's determination that there was no separate contractual agreement to

theories in turn.

*1. Agency*

The district court held that the Government was bound to arbitrate the dispute with Bridas because Turkmenneft signed the JVA as an agent of the Government. The parties dispute whether a finding that the Government is bound to the JVA by principles of agency is a matter of law, subject to plenary review, or a finding of fact that is reviewed merely for clear error. The Second Circuit has held that "[a]gency is a legal concept." *Interocean Shipping Co. v. Nat'l Shipping & Trading,* 523 F.2d 527, 537 (2d Cir. 1987); *Accord American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999). This court, however, appears to view the decision as a mixed question of law and fact, dominated by factual determinations and thus subject to review only for clear error. *See American Intern. Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 539 (5th Cir. 1987); *George v. C.I.R.,* 803 F.2d 144, 147 n. 2 (5th Cir. 1986), *vacated by* 485 U.S. 973 (1988)(vacated on independent grounds). *See* 3 Am. Jur. 2d Agency § 19 (2002)(noting that existence of agency is a question of fact). We need not decide this question

---

incorporate by reference into the JVA. Arguments that are insufficiently addressed in the body of the brief, however, are waived. *See Quick Techs., Inc. v. Sage Group PLC,* 313 F.3d 338, 343 n. 3 (5th Cir. 2002); *United States v. Hardman,* 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived").

-13-

because the district court's holding that Turkmenneft is an agent of the Government does not withstand our review, regardless of the standard applied.

Turkmenneft is entitled to a "presumption of independent status." *Hester International Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 176 (5th Cir. 1989). Bridas, therefore, carried the burden of proving that Turkmenneft signed the JVA as an agent of the Government. *Id.; Hofherr v. Dart Indust., Inc.,* 853 F.2d 259 (4th Cir. 1988). Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). An agency relationship may be demonstrated by "written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." *Hester,* 879 F.2d at 181. *See Arriba Limited v. Petroleos Mexicanos,* 962 F.2d 528, 536 (5th Cir. 1992). If Turkmenneft indeed signed the JVA in its capacity as the Government's agent, the Government would be bound by the JVA's arbitration requirement. *See Srivastava v. C.I.R.,* 220 F.3d 353, 369 (5th Cir. 2000).

The district court primarily relied upon three pieces of evidence to support its determination that Turkmenneft signed the JVA as the Government's agent. First, it pointed to a letter

from Mr. Suyunov, Deputy Chairman of the Council of Ministers of Turkmenistan, and Mr. Ishanov, Chairman of the Turkmenian Party, that confirmed, during negotiation of the JVA, that "all Joint Venture Keimir rights...established in the organization documents are fully and completely guaranteed by the Government, and there is no additional need for any further decisions, decrees, or approvals."[8]  Second, the district court referred to Article 22.3 of the JVA which states that the "[i]nterests, rights and obligation of Turkmenistan" are represented by the Turkmenian Party.  *See supra* note 6.  Third, the district court relied upon a statement made in a 1996 letter by the Government's Ministry of Oil and Gas to the director general of JVK and JVY (another joint venture with Bridas), that "the Ministry is the Turkmenian Party."[9]

Given the language and structure of the JVA, these evidentiary findings are insufficient to support an agency

---

[8]To the extent that the district court implied that the contents of this letter were contained within the JVA, it clearly erred.

[9]The letter from the Ministry was addressed to Mr. Schreiterer, the Director General of both JVK and JVY, in reference to both of the joint ventures.  The district court distorted the meaning of the statement that "the Ministry is the Turkmenian Party" by inserting a reference in the middle of the quoted statement to JVK.  In reality, the statement could easily have been in reference to JVY, not JVK.  The district court, however, chose to interpret the statement as referring to JVK, and in the absence of firmer evidence to the contrary, we accept its interpretation.

determination.  First, typically a guarantor cannot be compelled to arbitrate on the basis of an arbitration clause in a contract to which it is not a party.  *Interocean Shipping Co. V. Nat'l Shipping & Trading Co.,* 523 F.2d 527, 539 (2d Cir. 1975).  *Accord Hester,* 879 F.2d at 176, 180-81 (holding that an instrumentality of Nigeria was not the government's agent for purposes of an agreement between the instrumentality and an American corporation despite a guarantee by the Nigerian government for all loans necessary for offshore financing).  Second, a statement of representation, such as that in Article 22.3, in the midst of a provision regarding oral modifications of the agreement, is not remarkable.  "All corporations to some degree represent their owners," and Turkmenneft is an oil company wholly owned by Turkmenistan.  *Hester Intern. Corp v. Federal Republic of Nigeria,* 879 F.2d 170, 180 (5th Cir. 1989).  As we have held in the past, such a statement does not establish an agency relationship.  *Id.* at 180.  And third, the 1996 letter from the Ministry, while probative of how the Government conceived of its role in JVK in 1996, does not overcome the fact that the preamble to the JVA defines the Turkmenian Party as Turkmenneft – a "legal entity within the meaning of the laws of Turkmenistan" – not the Government or the Ministry.  The JVA was signed in 1993, before the Ministry penned the letter that Bridas claims demonstrates that Turkmenneft signed the JVA as an agent.

Arbitration agreements apply to nonsignatories only in rare circumstances. *Westmoreland v. Sadoux,* 299 F.3d 462, 465 (5th Cir. 2002).[10] We are simply unable to conclude that the parties, one a multi-national corporation who has negotiated joint venture agreements in the past, and the other, a sovereign nation, both represented by able counsel, intended Turkmenneft to sign the JVA as an agent of the Government in the absence of clearer language to that effect.

> The mere fact that one is dealing with an agent, whether the agency be general or special, should be a danger signal, and, like a railroad crossing, suggests the duty to stop, look, and listen, and he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority[.]

*Standard Acc. Ins. Co. V. Simpson,* 64 F.2d 583, 589 (4th Cir. 1933). *Accord Racicky v. Farmland Indus. Inc.,* 328 F.3d 389, 393 (8th Cir. 2003). Had Bridas truly felt that Turkmenneft was signing the agreement not for itself but on behalf of the Government, it had the obligation to make that fact clear on the

---

[10]The Government argues that *Westmoreland* does not permit us to use agency principles to bind a nonsignatory to an arbitration agreement. The Government reads *Westmoreland* too broadly. There, we held that a nonsignatory could not compel arbitration merely because he was an agent of one of the signatories. 299 F.3d at 466. This is a distinctly different question from whether a signatory may compel the principal of a signatory agent to arbitrate under an agreement that the agent signed as an authorized representative of the principal. *Westmoreland*, therefore, does not bar us from considering this claim.

face of the agreement. This could have been accomplished in a myriad of ways. Bridas could have requested that the Government sign the agreement, or inserted a prominent and direct statement as to Turkmenneft's status. Bridas has not presented any evidence that would permit us to excuse such an oversight. Bridas was doubtlessly well aware of the risks inherent in investing in countries of the former Soviet Union in 1993, and the possibility that its investment would be swept away in political turmoil. We will not bind the Government to the agreement, simply because Bridas lost a gamble that it was willing to take. To do otherwise would vitiate the predictability of the legal backdrop against which the parties voluntarily agreed to do business. *See Westmoreland,* 299 F.3d at 467.

Bridas has set forth ample evidence regarding the extent to which Turkmenneft was controlled by the Government *subsequent* to the signing of the JVA. Such evidence, however, does not establish that Turkmenneft had the apparent authority to bind the Government in 1993. Bridas did not satisfy its burden in this regard, and the district court's holding that Turkmenneft signed the JVA as an agent of the Government was clearly erroneous.

*2. Alter Ego*

Courts occasionally apply the alter ego doctrine and agency principles as if they were interchangeable. *See House of Koscot*

*Dev't Corp. V. American Line Cosmetics, Inc.,* 468 F.2d 64 (5th Cir. 1972).  The two theories are, however, distinct.  Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, "when their conduct demonstrates a virtual abandonment of separateness."  *Thomson-C.S.F.,* 64 F.3d at 777.  This is due to the doctrine's strong link to equity.  *See Harrell v. DCS Equip. Leasing Corp.,* 951 F.2d 1453, 1458 (5th Cir. 1992).  *Accord McCarthy v. Azure,* 22 F.3d 351, 362-3 (1st Cir. 1994)(holding that the alter ego doctrine can be invoked "only where equity requires the action to assist a third party").  The laws of agency, in contrast, are not equitable in nature, but contractual, and do not necessarily bend in favor of justice.  Courts are thus comparatively free from the moorings of the parties' agreements when considering whether an alter ego finding is warranted.

This is not to say that the decision to apply the alter ego doctrine to bind a parent is made routinely.  "Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration."  *ARW Exploration Corp. V. Aguirre,* 45 F.3d 1455, 1461 (10th Cir. 1995).  The corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality only if (1) the owner exercised complete control

over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *American Fuel Corp. v. Utah Energy Dev't Co., Inc.,* 122 F.3d 130, 134 (2d Cir. 1997). *Accord First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 629-30 (1983); *Gardemal v. Westin Hotel Co.,* 186 F.3d 588 (5th Cir. 1999). *Cf. Matter of Sims,* 994 F.2d 210 (5th Cir. 1993)(holding that an element of fraud must be present before courts will pierce the corporate veil in a case based upon a contract).

The district court held, in a brief paragraph, that the Government was not the alter ego of Turkmenneft. After finding that the evidence reveals that Turkmenneft was controlled by the Government, the court stated,

> [d]espite this control...Bridas has not offered evidence proving "an absence of corporate formalities." Moreover, there is no indication of "an intermingling of corporate finances and directorship" between Turkmenneft and the government. Thus, Turkmenistan cannot be bound under an alter ego theory.

Alter ego determinations are reviewed in this circuit only for clear error. *Zahra Spiritual Trust v. U.S.,* 910 F.2d 240, 242 (5th Cir. 1990). Errors of law, however, are not entitled to deference. *W.H. Scott Const. Co., Inc. v. City of Jackson,* 199 F.3d 206, 219 (5th Cir. 1999). *Accord United States v. Delgado-Nunez,* 295 F.3d 494, 496 (5th Cir. 2002)(noting that a mistake of

-20-

law is, by definition, an abuse of discretion); *In re Coastal Plains, Inc.,* 179 F.3d 197, 205 (5th Cir. 1999)(same).

The district court erred in premising its conclusion solely upon the existence of corporate formalities and an absence of comingling of funds and directors. Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. *Estate of Lisle v. C.I.R.,* — F.3d —, 2003 WL 21752801, at *8 (5th Cir. 2003). No single factor is determinative. This should be apparent from the extensive list of circumstances that courts have developed to guide alter ego determinations. *See id; Markow v. Alcock,* 356 F.2d 194, 197-98 (5th Cir. 1966); *American Fuel Corp.,* 122 F.3d at 134; *MAG Portfolio Consultant, GMBH, v. Merlin Biomed. Group LLC,* 268 F.3d 58, 63 (2d. 2001). Because the district court failed to take into account all of the aspects of the relationship between the Government and Turkmenneft, it committed an error of law and must reconsider the issue on remand.[11]

_____

[11]Once it has been determined that the corporate form was used to effect fraud or another wrong upon a third-party, alter ego determinations revolve around issues of control and use. *See Estate of Lisle,* — F.3d —, 2003 WL 21752801, at *8 (5th Cir. 2003). On remand, the court should explore the totality of the environment in which Turkmenneft operated, including those factors normally explored in the context of parent-subsidiary alter ego claims, such as whether:

(1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common

directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

*Id.* at *8 n.16 (citing *Oxford Capital Corp. v. United States,* 211 F.3d 280, 284 n.2 (5th Cir. 2000)).  Additional factors include: (1) whether the directors of the "subsidiary" act in the primary and independent interest of the "parent,"; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the alleged dominator deals with the dominated corporation at arms length.  *Markow,* 356 F.2d at 197-98; *American Fuel Corp.,* 122 F.3d at 134.

While the preceding considerations are adaptable to a certain degree to the context of a sovereign government and its instrumentality, the district court should also consider the factors that we take into account when determining if a state agency is the "alter ego" of a state for 11th amendment sovereign immunity purposes:

(1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Perez v. Region 20 Educ. Service Center,* 307 F.3d 318, 326-27 (5th Cir. 2002).  *Accord Vogt v. Bd. of Comm'r of Orleans Levee Dist.,* 294 F.3d 684, 688-89 (5th Cir. 2002).

*3.    Estoppel*

The use of equitable estoppel is within a district court's discretion.  *Grigson,* 210 F.3d at 528; *Hill v. G.E. Power Systems, Inc.,* 282 F.3d 343, 348 (5th Cir. 2002).  We, therefore, review the district court's decision to apply equitable estoppel only to ensure that the court did not abuse its discretion.  *Id.* "To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous."  *Id.*

The district court, relying on *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 527 (5th Cir. 2000), held that a nonsignatory may be equitably estopped from asserting that it is not bound by an arbitration agreement when the signatory raises allegations of substantially interdependent and concerted misconduct against both a nonsignatory and one or more of the signatories to the contract.

As the Government correctly points out, the district court misapplied the "intertwined claims" theory of equitable estoppel. *Grigson* does not stand for the proposition stated by the district court.  In *Grigson,* we estopped a *signatory* plaintiff from relying upon the defendants' status as a nonsignatory to prevent the *defendants* from compelling arbitration under the agreement.

-23-

210 F.3d at 526-28.  We justified applying equitable estoppel in *Grigson* in part because to do otherwise would permit the signatory plaintiff to "have it both ways."  *Id.* at 528.  *See Hill,* 282 F.3d at 349 (5th Cir. 2002).  "[The plaintiff] cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory."  *Grigson,* 210 F.3d at 528.[12]

The rationale of *Grigson* does not apply to the circumstances of this case.  Here, the Government, unlike the estopped party in *Grigson,* did not sign a contract containing an arbitration provision and never sued Bridas on the agreement.  The distinction is *not* one without a difference.  *E.I. Dupont De Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 202 (3d Cir. 2001).  The Second Circuit has expressly stated that the *Grigson* version of estoppel applies only to prevent "a *signatory* from avoiding arbitration with a

---

[12]*Grigson*, and the 11th Circuit decision that it relied upon, have been referred to as misguided deviations from traditional estoppel theories.  *See* J. Douglas Uloth & J. Hamilton Rial, III, Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate – A Bridge Too Far?, 21 Rev. Litig. 593, 603-04 (2002).  *See also Grigson,* 210 F.3d at 531 (Dennis, J., dissenting)("[N]early anything can be called estoppel.  When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel.").

nonsignatory when the issues the *nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.*"  *Thomson-CSF*, *S.A.*, 64 F.3d at 779 (emphasis added).  "[B]ecause arbitration is guided by contract principles, the reverse is not also true: a signatory may not estop a nonsignatory from avoiding arbitration regardless of how closely affiliated that nonsignatory is with another signing party."  *MAG Portfolio Consult, GMBH,* 268 F.3d at 62.  The Third Circuit reached the same conclusion in *DuPont.* 269 F.3d at 202.

As the Government correctly notes, the result in *Grigson* and similar cases makes sense because the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory.  *See* J. Douglas Uloth & J. Hamilton Rial, III, Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate – A Bridge Too Far?, 21 Rev. Litig. 593, 633 (2002).  "It is more foreseeable, and thus more reasonable, that a party who has actually agreed in writing to arbitrate claims with someone might be compelled to broaden the scope of his agreement to include others."  *Id.*  The simple fact that *Bridas's* claims against Turkmenneft and the Government are inextricably intertwined (a finding of the district court which is not clearly erroneous) is insufficient, standing alone, to justify the application of equitable estoppel

to the *Government's* assertion that it is not subject to the Tribunal's jurisdiction. Were this to become the case, this expanded version of equitable estoppel would "threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement." *Id.* at 632. The district court thus abused its discretion in applying the intertwined claims theory of equitable estoppel to this case.

Bridas, however, contends that the district court's decision may nonetheless be affirmed on the basis of the "direct benefits" version of estoppel.[13] Direct benefits estoppel applies when a nonsignatory "knowingly exploits the agreement containing the arbitration clause." *DuPont*, 269 F.3d at 199. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d. Cir. 1993)(holding that non-signatory local affiliate, who used a trade name pursuant to an agreement that it ratified which contained an arbitration clause, was estopped from relying on its nonsignatory status to avoid arbitrating under the agreement); *American Bureau of Shipping v. Tencara Shipyard S.P.A.* 170 F.3d 349, 353 (2d Cir. 1999)(binding non-signatory to a contract under

---

[13]*See DuPont,* 269 F.3d at 195 (3d. Cir. 2001); *American Bureau of Shipping v. Tencara Shipyard S.P.A,* 170 F.3d 349, 351–53 (3d. Cir. 1999); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1062-64 (2d. Cir. 1993); *International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir. 2000); *Sam Reisfield & Son Import Co. v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir. 1976); *Westmoreland,* 299 F.3d at 467.

which it received direct benefits of lower insurance and the ability to sail under the French flag).

There is an important distinction, however, between cases where the courts seriously consider applying direct benefits estoppel, and the case at bar. In the former, the nonsignatory had brought suit against a signatory premised in part upon the agreement. *See, e.g., DuPont,* 269 F.3d at 199; *Deloitte,* 9 F.3d at 1064; *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir. 2000); *Tencara,* 170 F.3d at 351. Here, it is undisputed that the Government has not sued Bridas under the agreement. The Government has thus not "exploited" the JVA to the degree that the cases that consider applying this version of estoppel require.

### 4. *Third-Party Beneficiary*

Nor is the third-party beneficiary doctrine availing. While very similar to estoppel, the third-party beneficiary doctrine is distinct:

> Under third party beneficiary theory, a court must look to the intentions of the parties at the time the contract was executed. Under the equitable estoppel theory, a court looks to the parties' conduct after the contract was executed. Thus, the snapshot this Court examines under equitable estoppel is much later in time than the snapshot for third party beneficiary analysis.

*DuPont,* 269 F.3d at 200 n. 7. It is not enough, therefore, that the Government benefitted from the existence of the JVA. "[T]he

fact that a person is directly affected by the parties' conduct, or that he may have a substantial interest in a contract's enforcement, does not make him a third-party beneficiary." *Id.* *See DuPont,* 269 F.3d at 196-97 (noting the fact that a parent derived benefits from a contract executed by its subsidiary is insufficient to make it a third-party beneficiary).

Parties are presumed to be contracting for themselves only. *Fleetwood Enterprises, Inc. v. Gaskamp,* 280 F.3d 1069, 1075-76 (5th Cir. 2002). This presumption may be overcome only if the intent to make someone a third-party beneficiary is "clearly written or evidenced in the contract." *Id. Accord McCarthy v. Azure,* 22 F.3d 351, 362 (1st Cir. 1994)("[t]he crux in third-party beneficiary analysis...is the intent of the parties.").

For the same reasons given *supra,* the JVA simply does not evince the requisite clear intent to benefit the Government, other than to the degree ordinarily expected when an instrumentality of a sovereign enters into a contract to develop the country's natural resources. The JVA's integration clause, moreover, specifies that the terms of the agreement apply only to the parties, defined as the Turkmenian Party (i.e. Turkmenneft) and Bridas. *See, e.g. Lester v. Basner,* 676 F. Supp. 481, 484-85 (S.D.N.Y. 1987)(refusing to find a third-party beneficiary relationship generating an obligation to arbitrate where the contract itself "is silent as to whether [its] terms" apply to

the purported third-party beneficiaries).

Furthermore, we are again reluctant to bind the Government to the terms of the JVA on a third-party beneficiary theory because the Government has never filed a claim against Bridas premised upon the agreement, or otherwise sought to enforce its terms. *See, e.g., DuPont,* 269 F.3d at 192; *Industrial Electronics Corp. Of Wisconsin v. iPower Distribution, Inc.,* 215 F.3d 677 (7th Cir. 2000); *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.,* 915 F.2d 1351, 1354 (9th Cir. 1990). Bridas has not brought to our attention a case where a third-party beneficiary has been bound to arbitrate a dispute, arising under an agreement to which it is not a party, that the third-party itself did not initiate in court. We decline to do so for the first time today.

## III.

The next question presented in this appeal is whether the district court erred in upholding the Tribunal's award of damages in the TPA for breach of contract. This circuit recognizes the venerable rule announced by the Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436-37 (1953), in which it was held that only a "manifest disregard of the law" warrants vacating an arbitration award. *Prestige Ford v. Ford Dealer Computer Services, Inc.*, 324 F.3d 391, 395 (5th Cir. 2003). In *Prestige Ford*, we expounded the deferential standard first articulated in *Wilko*:

> [m]anifest disregard clearly means more than error or misunderstanding with respect to the law. The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it. To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable.

*Id.* (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933-34 (2d Cir. 1986)).

To determine whether the Supreme Court's "manifest disregard of the law" standard has been satisfied, we apply a two-prong inquiry (the "manifest-disregard test"). *Williams v. Cigna Fin. Advisors, Inc.*, 197 F.3d 752, 762 (5th Cir. 1999). We held in *Williams* that

> [f]irst, where on the basis of the information available to the court it is not manifest that the arbitrators acted contrary to the applicable law, the award should be upheld. Second, where on the basis of the information available to the court it is manifest that the arbitrators acted contrary to the applicable law, the award should be upheld unless it would result in significant injustice, taking into account all the circumstances of the case, including powers of arbitrators to judge norms appropriate to the relations between the parties.

*Id.   See also Harris v. Parker College of Chiropractic*, 286 F.3d 790, 792 n.1 (5th Cir. 2002) (applying the manifest-disregard test articulated in *Williams*).   Furthermore, it is settled in this circuit that this "extraordinarily narrow"[14] standard of review applies to claims brought pursuant to the FAA, such as the instant matter.   *Id.* at 761; *Williams*, 197 F.3d at 759.

The district court's refusal to vacate or modify the arbitration award is reviewed under the same standard as any other district court decision, with findings of fact that are not clearly erroneous accepted and questions of law considered *de novo*.   *Id.*   We thus review *de novo* the district court's application of the manifest-disregard test.

We now confront the first prong of the manifest-disregard test and address whether the arbitration panel applied the appropriate discount rate to convert projected lost revenues to present value.   As an initial matter, the parties do not dispute that English law governs in determining the proper amount of damages to be awarded for this breach of contract and, accordingly, that is the law that we apply.   *See Guaranty Nat. Ins. Co. v. Azrock Industries Inc.*, 211 F.3d 239, 243 (5th Cir. 2000) (citing *N.K. Parrish, Inc. v. Southwest Beef Indus. Corp.*, 638 F.2d 1366, 1370 n.3 (5th Cir. 1981)).   Turkmenneft argues

---

[14] *Gateway Technologies, Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993, 996 (5th Cir. 1995).   *See also Harris*, 286 F.3d at 792.

that the arbitration panel erred by failing to apply what it calls a market-based discount rate, adjusted only by excluding consideration of internal political risk, in determining the present-value equivalent of the estimated future income lost as a result of the breach.  In short, Turkmenneft asserts that the arbitrator downplayed or ignored market forces when setting the discount rate.  And, because the arbitrator's decision called for a discount rate that resulted in damages ostensibly greater than necessary for full compensation, Turkmenneft argues that the arbitrator's decision runs counter to English law, which limits recovery to actual damages.  *See, e.g., Robinson v. Harmon*, 1 Exch. 850, 855 (1848); *Ruxley Electronics & Const. Ltd. v. Forsyth*, [1995] 3 All. E.R. 268 (H.L. 1995); *Attorney General v. Blake*, [2001] 1 A.C. 268, 282 (H.L. 2000).  At bottom, then, Turkmenneft's appeal challenges the merits of the arbitrators' determination of the discount rate, and specifically requests that this court second-guess the arbitrators' determination in that regard.

It has been determined in this circuit that the selection of a discount factor "is a question of fact to be determined by the trier of fact."  *Huggs, Inc. v. LPC Energy, Inc.*, 889 F.2d 649, 657 (5th Cir. 1989) (citing *Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330 (1988)).  The force of this language is strengthened by the rigors of the manifest-disregard test, which,

as discussed, *supra*, endows arbitrators with wide discretion. *See, e.g., Williams*, 197 F.3d at 762.

Turkmenneft cites no English law that compels the use of a particular discount rate, or establishes a methodology for calculating the same.[15] And, there is simply no merit to Turkmenneft's assertion that the arbitrator's selected discount rate cannot, as a matter of law, possibly establish present-value damages equivalent to the stream of revenues projected to have been lost as a result of the breach. Present-value determinations are not an exact science; competent experts and competent arbitrators can adopt highly divergent opinions without being deemed incorrect as a matter of law. Here, the Tribunal considered a variety of evidence and considered the factors that it deemed most appropriate for this particular income stream: the risk inherent in the venture, potential inflation, and the time-value of money. Thus, given that (i) Turkmenneft can cite no legal authority indicating that the arbitrator misapplied the law, (ii) an arbitrator's determination of a discount rate is a question of fact that will depend on the case's unique circumstances and on differing opinions regarding financial or

---

[15] Indeed, Turkmenneft cites, only a statement from a treatise that loss-of-the-bargain damages are generally approximated by the market-value of the property, money, or services that the plaintiff was entitled to have received under a contract. *See* Harvey McGregor, *McGregor on Damages* § 26 (16th ed. 1997).

economic theory, and (iii) the high degree of deference we afford arbitral decisions of this kind, it is clear that Turkmenneft cannot satisfy the first-prong of the manifest-disregard test. Because it is clear that the first prong of this test is not satisfied, we need not address the second. Accordingly, the district court's determination upholding the arbitrator's discount rate is affirmed.

                              IV.

The final issue of this appeal is whether the district court correctly refused to vacate the Tribunal's award on the ground that it exceeded its authority by awarding punitive damages. Punitive damages were expressly forbidden by the terms of the JVA.[16] Acknowledging that (i) discount rates are generally employed to determine compensatory damages, not punitive damages, and (ii) the arbitrator's decision did not explicitly award punitive damages, an undeterred Turkmenneft argues that the Tribunal implicitly awarded punitive damages by setting the discount rate too low, and thus exceeded its authority.

Section 10(a) of the FAA provides that a court may vacate an award if an arbitral tribunal exceeds its powers during the course of arbitration. 9 U.S.C. § 10(a). It is well-settled in this circuit that, as a general proposition, arbitral action

---

[16] Article 24.4(H) of the JVA explicitly limits the damages that may be awarded, stating that "consequential, punitive, or other similar damages shall not be allowed."

contrary to express contractual provisions is not entitled to deference upon review. *See American Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, — F.3d —, 2003 WL 21940716, at *3 (5th Cir. 2003); *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989). Thus, if punitive damages were indeed awarded in this case, it would be incumbent upon us to vacate such an award, in spite of the discretion typically granted to arbitral decisions.

No plausible argument, however, can be made that the Tribunal awarded punitive damages. Under English law, punitive damages are those that extend "beyond mere compensation of the claimant." 1 Chitty on Contracts § 27-017 (H.G. Beale, gen. ed., 28th ed. 1999). *See also Attorney General v. Blake*, [2001] 1 A.C. 268, 282 (H.L. 2000). Thus, any award that does not further the goal of compensation is impermissible under the terms of the agreement. Turkmenneft's bald claims to the contrary, there is simply no colorable argument that an award of punitive damages was embedded in the arbitrator's determination of the discount rate, given our conclusion, *supra*, that the arbitrator did not manifestly disregard the law in setting the discount rate. Thus, because there was no explicit award of punitive damages and the discount rate, a device used for setting compensatory damages, was not selected in manifest disregard of the law, we reject Turkmenneft's argument that the arbitrator awarded punitive

damages.  Accordingly, the district court's determination on this issue is also affirmed.

## CONCLUSION

For the foregoing reasons, the district court's decision refusing the vacate the FPA because the Government was subject to the jurisdiction of the Tribunal is VACATED and REMANDED.  The district court's refusal to vacate or modify the TPA or Final Award is AFFIRMED.

VACATED and REMANDED in Part, AFFIRMED in Part