**Opinion filed August 21, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-23-00126-CV

_____

## JOHN DEATON AND DEATON LAW FIRM, LLC, Appellants

## V.

## LAW OFFICES OF STEVEN M. JOHNSON, P.C., Appellee

**On Appeal from the 48th District Court**
**Tarrant County, Texas**
**Trial Court Cause No. 048-283747-16**

### O P I N I O N

At times, minor disagreements and contrasting views evolve into lingering and contentious litigation. In the eyes of many, disputes of this nature are never-ending and fade into an abyss. This case—as other courts have also noted—is no exception.

The matter before us concerns the latest chapter in the parties' ongoing feud, which has spanned decades, over the distribution of attorney's fees. The parties have battled over this issue in numerous state and federal courts in Texas—at all levels of the judiciary—and in other venues beyond our state's borders; however, none of

these courts, or the arbitration tribunals to whom these courts have deferred, have determined the *merits* of the parties' core dispute. We do so today.

Here,[1] Appellants, John Deaton and Deaton Law Firm, challenge the trial court's grant of the motion to compel arbitration filed by Appellee, the Law Offices of Steven M. Johnson, P.C., and its order confirming the arbitrator's final award. In three issues, Appellants contend that (1) the trial court erred when it compelled arbitration because no signed arbitration agreement existed between the parties, (2) vacatur of the arbitrator's award is warranted because arbitration without an agreement to arbitrate is an abuse of authority, which is an express ground for vacatur under both the Federal Arbitration Act (FAA) and the Texas General Arbitration Act (TGAA), and (3) a mandatory forum selection clause and an already-pending lawsuit in another jurisdiction prohibited the parties from arbitrating in this case. For the reasons expressed below, we affirm.

---

[1]Appellants originally appealed to the Second Court of Appeals. This appeal was subsequently transferred to our court by order of the Texas Supreme Court after the seven justices of the Second Court of Appeals recused. *See* TEX. GOV'T CODE ANN. § 73.001(a) (West Supp. 2023); *Miles v. Ford Motor Co.*, 914 S.W.2d 135, 137 (Tex. 1995); *see also* TEX. R. APP. P. 16.2 (grounds for recusal of an appellate court justice or judge); TEX. R. CIV. P. 18b(b) (grounds for recusal). As the transferee court, we must decide the issues raised in this appeal in accordance with the precedent of the Second Court of Appeals if its precedent conflicts with ours. *See* TEX. R. APP. P. 41.3.

## I. *Factual and Procedural Background*

This appeal is the next edition[2] to an already tortured procedural chronicle "that exceeds all bounds of reasonable behavior."[3] At the bottom of this litigious bog lies an unpleasant truth. Working together in mass tort litigation that involved hernia repair Kugel Mesh, from approximately 2008 to 2015, the parties agreed to share attorney's fees that were generated from that litigation. Eventually, their relationship soured and, rather than resolving their disagreements in a civil manner, for years they have opted to engage in costly, prolonged, and largely ineffective litigation across the full gamut of available dispute resolution mediums—including filings in multiple state and federal trial and appellate courts, as well as engaging in, at times over objection, mediation and arbitration. Because the context of the parties' unraveled relationship is important to our analysis, we review the background of their disputes and resulting battles in grave detail.[4]

---

[2]*See In re: All Individual Kugel Mesh Cases*, No. PC-2008-9999, 2022 WL 19705089, at *1–9 (R.I. Super. Ct. Nov. 10, 2022) (providing an exhaustive review of the relevant background and history of the parties' disputes); *Deaton v. Johnson*, C.A. No. 22-187WES, 2023 WL 3158933, at *1 n.1 (D. R.I. Apr. 26, 2023) (recounting the abundant decisions, opinions, and orders pertaining to the parties' disputes). Additionally, the United States District Court for the Northern District of Texas, Fort Worth Division, recently dismissed the claims that Appellants asserted against Appellee and others for breach of contract, fraud and fraud in the inducement, tortious interference, and conspiracy, because these claims had already been litigated and adjudicated or could have been litigated or adjudicated in the arbitration proceeding underlying this appeal. *See Deaton v. Johnson*, No. 4:23-CV-00415-O, 2024 WL 920082 (N.D. Tex. Mar. 4, 2024) (slip op.).

[3]The Honorable Mark Whittington, the arbitrator in the underlying proceeding, who is also a former state district court judge and a former justice of the Fifth Court of Appeals sitting in Dallas, keenly described this feud as an "extraordinary dispute" in which "[b]oth sides have engaged in unprofessional conduct and their actions have benefitted neither themselves nor their clients." We agree.

[4]Here, we focus primarily on Appellants' conduct because it is their conduct that determines whether they "embraced" the ARAs under the doctrine of direct benefits estoppel. This focus does not imply that either party's behavior was more or less unreasonable as their disputes percolated over time.

A. *The Parties' Original Agreements*

The genesis of the parties' relationship began in 2008, when Appellee began filing lawsuits in Rhode Island and elsewhere on behalf of numerous clients[5] alleging that the clients' injuries and conditions were caused by defective Kugel Mesh implants that were manufactured by C.R. Bard, Inc., and its subsidiary Davol, Inc. (following the parties' style in their briefs, we will refer to the manufacturer-defendants collectively as Bard/Davol). Appellee, a Texas law firm, executed an Attorney Representation Agreement (ARA) with each client, including Moreno. The ARAs specify that they (1) were executed in Tarrant County, (2) are to be construed pursuant to Texas law, (3) are performable in Texas, (4) permit Appellee to retain associate counsel to represent the clients, and (5) require the clients and Appellee to arbitrate "any dispute arising from the interpretation, performance, or breach" of the agreement in Fort Worth.

In connection with some of the ARAs, and through a general fee-sharing agreement, Appellee engaged Appellants to act as local counsel for Appellee by filing Kugel Mesh lawsuits in a Rhode Island superior court. Initially, the parties to this appeal agreed that Appellants would receive five percent of all attorney's fees that were ultimately recovered in the lawsuits that they filed as local counsel for Appellee. This fee-sharing agreement, which is expressed in an e-mail from Appellee to Appellants, is reproduced below:

---

[5]One such client is Margaret Moreno, the original plaintiff in the underlying lawsuit that generated this appeal. Moreno originally filed a legal malpractice action against both Appellee and Appellants and moved to compel arbitration. Appellee answered and filed cross-claims against Appellants. Moreno later nonsuited her claims.

John
I am attaching a Complaint .
Please review for form, style, and compliance with local standards.
Please provide the proper signature block.
Please provide the Pro Hac Vice rules/motion or what ever else is needed for me to make appearances.
If you can provide the additional documents that need to be completed to file locally in Providence we can complete them. The Summons, citiation, Civil Cover Sheet, and whatever else needs to be done.
Please let me know the fees involved in filing and serving these complaints too.
Can we write one check to the clerk of the court for all of the cases we file ? Do we need seperate checks?
We may have as many as 70 of these to file by next Friday.

I will draft a letter agreement regarding payment for your services. Here is my understanding of our agreement, please let me know ifyou propose any changes. I intend to pay you 5% of the attorney fee in the cases filed where you are listed and act as local counsel. You will keep you time and I will consider a bonus depending on time spent, results, money saved on common benefit fees, etc. You will make all necessary local appearances on motions and other matters short of trial.
Thanks

As further stated below, the parties later agreed to increase Appellants' attorney's fee recovery to ten percent:

> It is understood and agreed upon by The Deaton Law Firm and The Johnson Law Firm that The Deaton Law Firm will receive 10% of the attorney fees earned in all Rhode Island Kugel Mesh cases filed by The Deaton Law Firm as local counsel for The Johnson Law Firm.
>
> It is intended by the parties that this agreement supersedes any previous referral agreement and specially supersedes the previous agreement with the Deaton Law Firm to receive 5% of the attorney fees related to the Kugel Mesh cases filed in Rhode Island Superior Court.
>
> Finally, the case of Rickie Patton (Case No. 07-1842-ML) filed in Federal Court is covered by a separate referral agreement.

Appellants filed 176 Kugel Mesh lawsuits in a Rhode Island superior court as local counsel for Appellee. Appellee prepared each individual client's original complaint and sent them to Appellants, who filed the complaints in the superior court. The parties also agreed that Appellants would file and argue any motions regarding the reduction of certain fees related to the mass tort litigation and that Appellee would consider paying a bonus to Appellants based on the results of these additional efforts.

B. *The Patton Referral*

Appellee also filed Kugel Mesh lawsuits in federal court, which were later consolidated with other pending lawsuits into a multi-district litigation (MDL)

docket in the United States Court for the District of Rhode Island. After the federal district court there slated one of Appellee's lawsuits, for a plaintiff named Rickie Patton, as a bellwether case in the MDL proceedings,[6] Appellee and Appellants executed a separate referral agreement, reproduced below, through which they agreed that Appellants would serve as Patton's lead trial counsel, and Appellee would receive one-third of the recovered fees:

<u>**REFERRAL AGREEMENT**</u>

It is hereby agreed between The Deaton Law Firm, LLC (Deaton) and The Johnson Law Firm (Johnson) that Johnson is referring the Kugel Mesh-related personal injury case of **RICKIE L. PATTON** to Deaton.

Deaton will forward 1/3 of the gross attorney fees earned in the **PATTON** referral to Johnson. This 1/3 referral fee includes any and all settlements secured on behalf of the client, Rickie Patton.

It is understood between the parties that Deaton will be responsible for all filings of complaints, pleadings, depositions, settlements, trials, and/or appeals.

It is understood between the parties that Johnson will be responsible for the payment of all expenses incurred related to the *Patton* case.

Deaton agrees to keep Johnson up to date on the case and to provide status reports upon request.

This agreement was executed in August 2012. At the outset, Appellants asserted that, by this agreement, Appellee relinquished settlement authority to them for the Patton lawsuit; however, Appellants later conceded that this was not so. Appellants "[f]ront[ed] tens of thousands of dollars" to develop Patton's lawsuit for trial, including conducting nine depositions, propounding discovery, retaining and deposing experts, and engaging in motion practice. Appellee reimbursed Appellants for some of the costs associated with their efforts. In this regard, Appellant Deaton stated that he essentially put his entire law practice on hold for approximately six months so that he could focus exclusively on the Patton lawsuit.

---

[6]*See All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *1.

The Patton lawsuit morphed into a momentous point of contention between the parties, who, not surprisingly, contest the facts underlying that dispute. Patton's lawsuit was selected as a bellwether case by Bard/Davol. "Bellwether" lawsuits help establish a "party liability" baseline for similar lawsuits. As such, rather than proceeding to trial in every individual lawsuit, the parties litigate a small number of bellwether lawsuits, the results of which serve as benchmarks that can extrapolate the "floor" and the "ceiling" of settlement values for all such lawsuits. Typically, the defendants and the plaintiffs in these cases are both permitted to select some of the lawsuits that will be tried as bellwether cases. Consequently, product liability defendants like Bard/Davol would select lawsuits that had very poor prospects of establishing liability for those defendants as bellwether cases, while plaintiffs would select focal cases that best presented their theory of product liability.

Regarding Patton's lawsuit, Appellee believed that "enormous problems" existed with it, namely that Patton had a preexisting medical history of developing hernias, which complicated proving a causal link between the alleged Kugel Mesh defects and Patton's claimed injuries. Because of this, according to Appellee, some expert witnesses were not willing to testify that the Kugel Mesh specifically caused Patton's injuries. In addition, the timeline of Patton's lawsuit was compressed by an impending statute-of-limitations deadline and a constricted scheduling order imposed by the federal district court. Appellants were aware of the "issues" that existed in Patton's lawsuit but agreed to accept a referral and to take the lead in preparing Patton's lawsuit for trial.

In November 2012, the Patton lawsuit was removed from the federal district court's active docket, and it was never tried as a bellwether case. Appellee asserts that this was because Patton's lawsuit was weak from the beginning, had little chance of success, and Appellants had failed to work up the case adequately, which resulted in their causation expert witness being struck. Appellants, on the other hand,

believed that they had diligently created enough uncertainty in the outcome of the Patton lawsuit, that they had clearly demonstrated their commitment to taking the case to trial, and that their preparation had influenced Bard/Davol's decision to settle all of Appellee's pending Kugel Mesh lawsuits. Appellants also believed that Patton's lawsuit had a potentially high settlement value based on other settled cases that Appellants perceived to be factually similar to Patton's.

C. *Appellee and Bard/Davol Settle*

In June 2014, Appellee reached a global settlement with Bard/Davol for its state and federal court Kugel Mesh clients, and a Master Settlement Agreement (MSA) was executed, which provided a framework for individual settlements between Bard/Davol and Appellee's clients. Although Appellants assert that the development of the Patton lawsuit was a significant factor in the negotiation and execution of the MSA, Appellee contends that unrelated developments in Kugel Mesh lawsuits that they filed in Illinois, for which Appellants did not serve as local counsel, were the moving force toward consummating the settlement.

In any event, settlement negotiations had been ongoing for some time and Appellants and Appellee were both involved in those negotiations. At some point, Appellee and Bard/Davol agreed that the Honorable Alice Gibney of the Rhode Island superior court should preside over the mediation of all of Appellee's pending lawsuits, including those filed in other state and federal courts. While mediation was ongoing, Justice Gibney appointed Appellants to take the lead in negotiating with Bard/Davol because Appellee's interactions with Bard/Davol had become contentious.

The MSA provided that each claimant could choose to execute a release of all claims asserted, or to be asserted, against Bard/Davol. In consideration, Bard/Davol agreed to pay each claimant a confidential settlement amount, inclusive of attorney's fees and costs. This settlement proposal was contingent on a certain threshold

8

percentage of Appellee's clients opting into the settlement framework. Once the requisite percentage of Appellee's clients reached these thresholds, Bard/Davol agreed to fund a Qualified Settlement Fund (QSF), which would be established by the Rhode Island superior court pursuant to Section 468B of the Internal Revenue Code and be administered by an independent third-party administrator.

The MSA contained a confidentiality provision that applied, among other things, to the disclosure of settlement amounts paid to settling claimants. The MSA provided that only counsel, co-counsel, and claimants, as defined in the MSA, are exempted from the confidentiality requirement and defined "Claimants' Counsel" as "the Johnson Law Firm and the counsel, if any, listed on Exhibit 2." No "Exhibit 2" is included in the record before us and it is undisputed that Appellants were neither listed nor identified in this exhibit. The MSA further provided that "Claimants' Counsel represents and warrants that 100% of its known Claimants are participating in this Agreement."

The MSA also required that "[a]ny dispute arising under this Agreement or relating to the subject matter thereof, shall be filed only in the Superior Court of Rhode Island and Settling Claimants, Claimants' Counsel and/or Co-Counsel hereby submit himself, herself, itself, or themselves to the personal jurisdiction of the Superior Court of Rhode Island."

D. *The Parties' Fee Dispute Erupts*

Although Appellee claimed that it notified Appellants that they had negotiated a global settlement for the Kugel Mesh clients, Appellants asserted that they only discovered the global settlement amount through Patton, who had received a settlement packet in the mail from Appellee that contained information about the global settlement. Appellants began inquiring about the global settlement's terms and how the terms would pertain to Patton specifically; however, Appellee did not immediately discuss those particulars with Appellants. Appellants claimed that

Patton had high expectations for the amount of monies that he would receive from the settlement and that they had incurred significant expenses in preparing Patton's case for trial. However, Appellants stated that, as long as Patton consented to and agreed with the settlement terms, Appellants would accept the settlement terms as well.

Patton opted into the global settlement without Appellants' immediate knowledge. Appellants speculated that Appellee avoided disclosing settlement information to them because the settlement amount allocated to Patton was lower than Appellants believed it should have been. Appellants suggested that Patton may not have opted into the global settlement if they had been able to advise him of its implications.

Sometime after the execution of the MSA, Appellee sent Appellants a stipulation to sign; the executed stipulation was required to establish the QSF. In the letter that accompanied the stipulation, Appellee stressed the time sensitivity of the QSF stipulation, because it was a requisite part of moving forward with the QSF, and they requested that Appellants execute it immediately. Appellants also were contacted by Bard/Davol during this time and were asked to dismiss their clients' lawsuits because a settlement had been reached. The QSF stipulation did not purport to dismiss any pending lawsuits nor did it refer to any specific claimant settlements, and Appellee did not ask Appellants to sign any client dismissals in connection with the QSF stipulation.

Instead of executing the QSF stipulation, Appellants repeatedly asked Appellee for information to evaluate the global settlement, explaining that they needed to ensure that the settlement was in the clients' best interests and that it would be inappropriate for them to sign dismissals or to execute the QSF without reviewing the settlement information. Appellants also informed Bard/Davol that they would

not sign the QSF stipulation, or dismiss any pending lawsuits, until they had received and reviewed this settlement information.

Appellee was concerned that Appellants could not be exempted from the MSA confidentiality requirement because Appellants had worked with other law firms and clients in the Kugel Mesh litigation, and therefore could not meet the MSA provision that "Claimants' Counsel represents and warrants" that 100% of its known claimants were participating in the MSA. Appellee also complained that Appellants never specified what information they wished to receive, although Appellants insisted that they had listed and identified such information in the letters they sent to Appellee. Appellants emphasized that they were the only counsel of record in the Rhode Island state court lawsuits, that they at times had spearheaded the settlement negotiations between Appellee and Bard/Davol, and that the confidentiality concerns cited by Appellee were absurd.

Appellee asserted that, due to the contentious relationship with the attorneys representing Bard/Davol, Appellee was concerned that these attorneys would consider the disclosure of any MSA information to Appellants to be a breach of the MSA, and therefore void the settlement. However, in a letter to Appellee, Bard/Davol's counsel authorized Appellee to "share any and all information with [Appellants] as if [they were] a claimant's Counsel and/or co-Counsel, as those terms are defined and used in the MSA." Even after this, Appellee did not provide settlement information to Appellants and continued to cite confidentiality concerns as the reason.

In connection with this dispute, Appellants eventually sent a letter to Bard/Davol that provided notice of their intent to file a $1 million attorney's fee lien against the settlement funds. Appellants later expressed that the information they required included: (1) which clients had opted in or out of the global settlement, (2) which clients' lawsuits would be dismissed with prejudice, (3) whether

Appellant should take the lead for the clients who opted out of the settlement, and (4) the contingency fee percentages contained in each client's ARA, so that Appellants could determine their attorney's fee recovery.

Appellants' refusal to execute the QSF stipulation delayed the funding of the QSF for months. Because Appellants refused to pursue any requested action to establish the QSF and thus facilitate the payment of the settlement funds to the clients, Appellee terminated Appellants as local counsel and engaged replacement local counsel who promptly executed the QSF stipulation. Appellants refused to accept this, even though they received multiple client affidavits confirming their termination; they also refused to withdraw from the lawsuits filed in the Rhode Island superior court.

E. *$1 Million of QSF Funds are Segregated for Distribution*

Despite their termination, Appellants filed a motion on behalf of all Kugel Mesh clients in the Rhode Island superior court for whom they had filed lawsuits, in which Appellants moved to compel Appellee to disclose the settlement allocations and to enforce their attorney's fee lien. In that motion, Appellants argued that they needed the settlement information, including each client's retainer information, to determine the amount of attorney's fees they were owed. On March 11, 2016, the Rhode Island superior court held a hearing on Appellants' motion and ultimately signed an order directing (1) the third-party administrator of the QSF to segregate $1 million of the settlement funds, (2) Appellee to provide Appellants with client ARAs, and (3) Bard/Davol to provide Appellants with the requested settlement allocations.

Over the next several months, Appellee, as directed, provided Appellants with client ARAs. Prior to these disclosures, Appellants executed a stipulation of non-disclosure of client information in which they stated that they had acted as counsel

12

in the Kugel Mesh litigation pursuant to the authority granted in the client ARAs. This stipulation is reproduced below:

**Stipulation as to Non-Disclosure of Protected JLF Attorney Client Information**

Whereas Johnson Law Firm, (JLF) has Attorney Representation Agreements (ARA) with certain clients to provide legal representation in exchange for a contingency fee, and John Deaton of the Deaton Law Firm was hired pursuant to the ARA and authorized by the ARA to act as counsel for clients in the Superior Court of Rhode Island and the United States District Court for the District of Rhode Island, Deaton seeks the benefits of the ARA contingency fee and to recover a portion of the contingent fee owed to JLF under the ARA for the work he purports to have done as counsel pursuant to the authority to do so granted in the ARA .

John Deaton is therefore considered as associated counsel pursuant to ARA, and is therefore within the scope of the attorney client privilege as it relates to the ARA's;. John Deaton of the Deaton Law Firm agrees that the ARA's are protected by the attorney client privilege and will not be disclosed, shared or disseminated to any other person or entity. *not employed by the Deaton law Firm.*

JOHN DEATON
DEATON LAW FIRM

From the information contained in the ARAs, it became evident that Appellants' maximum potential claim and recovery for the shared attorney's fees was less than $400,000. Nevertheless, Appellants did not modify or limit their attorney's fee lien or inform the Rhode Island superior court that the segregated amount far exceeded their maximum potential claim and recovery.

In addition to the excessive amount of the segregated funds, the superior court's segregation order failed to limit the source of these funds to only attorney's fees—which were also to be paid from the QSF—thus, the segregated funds include funds that are due the clients. In fact, the segregated funds remain in the QSF today.

F. *Patton Sues and Appellants Finance Patton's Lawsuit*

Soon afterwards, Patton sued Appellee and others for legal malpractice in federal court in Rhode Island. *See Patton v. Johnson*, C.A. No. 17-259WES, 2018 WL 3655785 (D. R.I. Aug. 2, 2018). The outcome of that lawsuit need not be fully discussed here; however, it is significant that Patton's protracted litigation against

13

Appellee in that case was promoted and financed by Appellants (who did not represent Patton in that lawsuit). *See Deaton v. Johnson*, C.A. No. 20-78WES, 2020 WL 4673834, at *2 n.5 (D. R.I. Aug. 12, 2020) (noting the "potentially troubling" fact that Appellants' expenditures in financing Patton's lawsuit substantially exceeded any possible amount that Patton could recover).

Following its own procedurally complex route, Patton's lawsuit eventually wound up in arbitration in Texas. The arbitrator rejected all of the claims that Patton had asserted against Appellee, and the United States District Court for the Northern District of Texas, Fort Worth Division, confirmed the arbitrator's award and signed a final judgment, which neither party appealed. *See Patton v. Johnson*, No. 4:19-CV-00698-O, 2022 WL 3012537 (N.D. Tex. June 23, 2022); *see also All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *1–9, *15–16 (comprehensively reviewing the travels of Patton's lawsuit and ultimately determining that the Northern District of Texas Court's confirmation order and final judgment precluded further litigation on the issue of arbitrability between Patton, Appellee, and Appellee's attorneys). It is Appellants' involvement in that litigation, rather than its substantive outcome, that is relevant to this appeal. As discussed below, Appellants not only financed Patton's lawsuit against Appellee, but they also later sought to recover the amounts they expended in that case from the $1 million segregated QSF funds.

G. *The Filing of Multiple Motions to Disburse the Segregated Funds*

Since 2020, Appellants have filed two motions to disburse the segregated QSF funds. First, in January 2020, Appellants filed a motion for attorney's fees on their own behalf with the Rhode Island superior court, which requested that the entire $1 million in segregated funds be disbursed to them from the QSF. *See In re: All Individual Kugel Mesh Cases*, No. PC-2008-9999, 2020 WL 6335955, at *2 (R. I. Super. Ct. Oct. 22, 2020). In that motion, Appellants argued that the attorney's fees

they incurred for the lawsuits filed in the Rhode Island superior court were between $387,000 and $396,000. Appellants dedicated the majority of their motion to arguments concerning events that occurred in the Patton lawsuit, which included allegations that an attorney who worked for Appellee met with Patton and misrepresented the amount of settlement funds that Patton would receive if he opted into the global settlement. Appellants later conceded that these allegations, which were supplied by Patton's affidavit, were false.

Appellants explained that, as a result of their representation of Patton, (1) they had incurred approximately $477,000 in attorney's fees and (2) the superior court could, on its face, accept that they would incur additional, substantial attorney's fees and costs that would likely exceed $130,000, thus incurring a combined attorney's fee debt in excess of $1 million. Interestingly, Appellants attorney's fees for Patton's Kugel Mesh settlement amounted only to approximately $37,000. The remainder of the attorney's fee amount that Appellants quoted in their motion concerned the fees and costs that they incurred in Patton's legal malpractice lawsuit against Appellee and its attorneys—an entirely separate affair that is not governed by the parties' referral agreement, and which Appellants, among other things, financed by retaining and compensating other attorneys and paying other litigation costs.

Appellee intervened and removed this lawsuit to federal court, but it was later remanded to the superior court. *Deaton*, 2020 WL 4673834, at *9. There, Appellee moved to stay Appellants disbursal motion, in part, on the basis that Appellants' entitlement to the segregated funds should be determined in the then-pending arbitration that is the focus of the appeal before us, in accordance with the FAA's mandatory stay provisions. *All Individual Kugel Mesh Cases*, 2020 WL 6335955, at *3. The superior court denied Appellee's request for a stay and, in doing so, discussed whether the doctrine of direct-benefits estoppel should bind Appellants to

15

the arbitration provision of the ARA. *Id.* at *4–5. The superior court found that it did not, because Appellants had not yet received any direct benefits, as, in its opinion, the application of the doctrine requires. It stated:

> To date, [Deaton] has received no benefits from the referral agreements that he signed, and which contained no arbitration clauses. It seems [the Johnson Law Firm] wants this Court to compel [Deaton] to arbitrate before he can receive the direct benefit of his agreement to serve as co-counsel based on the idea that [Deaton] has derived direct benefits from the [ARAs]. These two kinds of agreements are distinct and [the Johnson Law Firm's] attempts to conflate them are unavailing.

*Id.* at *5 (internal citations omitted).

The superior court further reasoned that Appellants had properly brought the motion to disburse, as Appellee had agreed to do under the MSA, because the MSA stipulation and the superior court's March 11, 2016 order segregating the $1 million of QSF funds and compelling Appellee to disclose settlement information to Appellants required it. *Id.* Finally, the superior court noted that, although the doctrine of direct-benefits estoppel applies in cases that involve non-signatories who *embrace* the contract but then attempt to repudiate its arbitration clause during the litigation process, Appellants had never attempted to *repudiate* the arbitration clause; rather, Appellants had simply pointed out that they were not a party to it. *Id.* Accordingly, the superior court declined to exercise its discretion to impose an obligation to arbitrate on Appellants. *Id.*

Appellee has appealed the superior court's ruling. Recently, on July 9, 2024, the Rhode Island Supreme Court issued an order regarding that appeal. *In re Kugel Patch*, 317 A.3d 781 (R.I. 2024). In its order, the court stated that "[i]t is clear to us that the circumstances of this case are far different now than . . . when the Superior Court issued its decision on Johnson's motion to stay." *Id.* at 783. Recognizing that the appeal of the superior court's ruling would become moot once the appeal now pending before us is decided and any further appeals are exhausted, the court

16

"deem[ed] it prudent to stay any further action on Deaton's motion to disburse until the remaining arbitration in Texas is finally resolved." *Id.* The court noted that, whatever the result of this or any subsequent appeal, it expressed no opinion regarding the "preclusive effect, if any, the arbitral proceedings may have on the issues that may later be raised in Superior Court." *Id.* at 783 n.2.

Appellants' second motion to disburse was filed in May 2022, when Patton requested that the Rhode Island superior court, through his attorney of record, Deaton, disburse his allocation of the QSF funds to Deaton as his trustee. *All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *8. This motion apparently also asserts that, pursuant to the referral agreement between Appellants and Appellee, Appellants must receive their attorney's fees from Patton's recovery and are solely responsible for asserting any claims for litigation expenses. *Id.* Once again, Appellee intervened and moved to stay Patton's motion. *Id.* Based on the preclusive effect of the many decisions issued by the state and federal courts in Texas that found Patton had agreed to arbitrate his disputes under the ARA, the Rhode Island superior court determined that the issues raised in Patton's motion were referable to arbitration under his ARA; accordingly, it granted Appellee's motion to stay Appellants' motion to disburse. *Id.* at *11–16.

Significantly, the superior court also noted that its retention of continuing jurisdiction over the QSF "did not thereby bind all claimants and their attorneys . . . to resolve all disputes underlying the proper calculation of their 'legal fees and costs' through *de novo* hearings or mini-trials before this Court." *Id.* at *15. The superior court further explained that "[g]iven the existence of a judicially confirmed—and evidently, an ongoing—arbitration proceeding between Patton and [Appellee], it is time to put the issue of arbitrability to bed so that the parties can resolve their

remaining substantive disputes." [7]  *Id.*  Finally, the superior court reaffirmed, albeit in a footnote, that although the MSA provides that venue for all disputes arising from the MSA rests with the superior court of Rhode Island, those provisions "do not change the outcome [of its decision to grant the stay], as the underlying proceedings before the Court involve a dispute between Patton and [Appellee] over attorneys' fees and costs, rather than any dispute over the substance of the Settlement Agreement." *Id.* at *16 n.11.

Thus, two stayed motions—one by Appellants and one by Patton, through his attorney, Appellant Deaton—to disburse the segregated funds from the QSF remain pending in the Rhode Island superior court.

H.  *Special Appearance, Arbitration, and the Appeal in This Case*

In February 2016, about a month before Appellants filed their motion to compel in the Rhode Island superior court, Moreno filed the underlying lawsuit against Appellants and Appellee in the 48th District Court of Tarrant County.  She subsequently moved to compel arbitration based on her ARA.  Appellee answered, filed cross-claims against Appellants, and eventually joined in Moreno's motion to compel arbitration.

Appellants filed a special appearance challenging the trial court's personal jurisdiction over them.  Appellants contended that they were not signatories to the Moreno ARA, which contained a forum-selection clause as well as an arbitration clause designating Fort Worth and Tarrant County as the proper forum for any dispute resolution proceeding.   The trial court denied Appellants' special

---

[7]Although a final award has been entered and confirmed in the Patton arbitration, the superior court characterized the arbitration as "ongoing." *All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *15. This is, in one court's estimation, because Appellee's fee entitlement has not yet been resolved and will not be until the QSF administrator issues its final determination of deductible court costs and expenses, and Patton receives the net disbursement from which he will owe Appellee its fee. *See Deaton*, 2023 WL 3158933, at *4 n.6.

appearance. On appeal from the trial court's ruling, the Second Court of Appeals affirmed the denial and, in doing so, explicitly relied on the language in the stipulation of nondisclosure that Appellants had executed. *See Deaton v. Moreno*, No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied) (mem. op.). The court held that, for jurisdictional purposes, as non-signatories, Appellants were subject to the forum-selection clause in the Moreno ARA under the doctrine of direct-benefits estoppel. *Id.*

The trial court subsequently ordered the parties to arbitration, over Appellants' objection. With Moreno having nonsuited her claims, Appellants and Appellee proceeded to arbitration. Upon the conclusion of the arbitration, the arbitrator determined that the fee-sharing agreement between Appellants and Appellee was unenforceable as against public policy because they had failed to obtain client consents to enter into the agreement. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Tex. State Bar R. art. X, § 9); *Cokinos, Bosien & Young v. Moore*, No. 05-18-01340-CV, 2020 WL 549066, at *2–6 (Tex. App.—Dallas Feb. 4, 2020, no pet.) (mem. op.). The arbitrator then awarded Appellants $135,000 in quantum meruit damages for services rendered to Appellee. Appellee thereafter filed an application to confirm the arbitrator's award. Appellants opposed Appellee's motion and filed a separate motion that (1) challenged the trial court's ruling that ordered the parties to arbitration, (2) challenged the resulting arbitration proceeding, and (3) sought to vacate the arbitrator's award. The trial court confirmed the arbitrator's award, Appellants appealed, and the appeal was later transferred to our court.

I. *Appellants File Suit Against Appellee in Federal Court in Rhode Island*

Around May 2022, Appellants filed suit against Steven Johnson, Blake Norvell, Jennifer Andrews, and Appellee in the Rhode Island superior court, and re-urged the fraud and breach-of-contract claims they had asserted against Appellee in

19

the appeal now before us. *See Deaton v. Johnson*, C.A. No. 22-187WES, 2023 WL 3158933, at *7 (D. R.I. Apr. 26, 2023). In this lawsuit, Appellants added claims for tortious interference and conspiracy against Appellee and the attorney defendants, alleging that the named defendants strategically conspired to force Appellants to arbitrate in Texas and thus avoid Appellee's obligation to share the disputed attorney's fees. *Id.* This lawsuit was removed to federal court in Rhode Island but was thereafter transferred to the United States District Court for the Northern District of Texas, Fort Worth Division; that court has since determined that all of Appellants' claims are precluded by the underlying lawsuit and arbitration proceedings that are the basis of the appeal that is now before us. *See id.* at *9–11; *see also Deaton v. Johnson*, No. 4:23-CV-00415-O, 2024 WL 920082, at *2, *4–5 (N.D. Tex. Mar. 4, 2024) (slip op.). As a result, the claims asserted by Appellants against each defendant were dismissed with prejudice. *See Deaton*, 2024 WL 920082, at *6.

Notably, in its ruling, the federal district court also denied the defendants' motion to declare Appellants as vexatious litigants, but issued a warning at the conclusion of its order that "any additional lawsuits [filed] in the Northern District of Texas, Fort Worth Division, which are of a similarly duplicative or antagonistic nature **SHALL** result in either a monetary sanction . . . or an injunction restraining [the attorney's] capacity to file or otherwise appear . . . in the Fort Worth Division." *Id.* at *6.

## II. *Standards of Review and Applicable Law*

### A. *The Trial Court's Order to Compel Arbitration*

We may review a trial court's order to compel arbitration as part of an appeal of a final judgment. *See In re Gulf Expl., LLC*, 289 S.W.3d 836, 842–43 (Tex. 2009); *Perry Homes v. Cull*, 258 S.W.3d 580, 586–87 & n.9 (Tex. 2008); *Chambers v. O'Quinn*, 242 S.W.3d 30, 32 (Tex. 2007) (citing *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 89 (2000)). We review a trial court's order granting a motion to compel

arbitration for an abuse of discretion; in this regard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review its legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 642–43 (Tex. 2009) (orig. proceeding); *see Perry Homes*, 258 S.W.3d at 585–87 & n.15. Where an abuse of discretion standard applies, and, as in this case, the trial court does not issue findings of fact and conclusions of law with its ruling, all facts necessary to support the trial court's judgment and which are supported by the evidence are implied. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *see also Labatt Food Serv.*, 279 S.W.3d at 643. We review de novo whether an arbitration agreement is enforceable. *See Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013); *Labatt Food Serv.*, 279 S.W.3d at 643.

Generally,[8] arbitration is required if (1) the parties agreed to arbitrate, and (2) the claims raised fall within the scope of the arbitration agreement. *See* 9 U.S.C. §§ 2, 4 (FAA); CIV. PRAC. & REM. §§ 171.001, 171.002, 171.021 (West 2019) (TGAA); *Rachal*, 403 S.W.3d at 843 (TGAA); *In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011) (FAA); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (FAA). Whether parties have agreed to arbitrate is a gateway matter that is ordinarily committed to the trial court and controlled by state law that governs "the

---

[8]The arbitration clause at issue in this appeal does not specifically invoke either the FAA or the TGAA, and neither party addresses this point. The FAA governs a contract that involves interstate commerce if the contract contains a valid arbitration provision and does not specify that the FAA will not apply. *Brand FX, LLC v. Rhine*, 458 S.W.3d 195, 202 (Tex. App.—Fort Worth 2015, no pet.). When both state and federal law apply to an arbitration agreement, state law is preempted "to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 97–98 (Tex. 2011) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989)). The TGAA and the FAA may both be applicable to an agreement, absent the parties' explicit selection of one or the other. *Id.* at 97 n.64 (citing *In re L & L Kempwood Assocs., L.P.*, 9 S.W.3d 125, 127–28 (Tex. 1999)). Here, the ground for which Appellants seek vacatur is substantially similar under either statute. *Compare* 9 U.S.C. § 10(a)(4), *with* CIV. PRAC. & REM. § 171.088(a)(3)(A); *see Gulf Expl., LLC*, 289 S.W.3d at 842. Because the substantive principles that are applicable to our analysis in this appeal and the available grounds to review an arbitration award are the same under both statutes, we may find guidance in court decisions that arise under either. *See Howerton v. Wood*, No. 02-15-00327-CV, 2017 WL 710631, at *2 (Tex. App.—Fort Worth Feb. 23, 2017, no pet.) (mem. op.).

validity, revocability, and enforceability of contracts generally." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 631 (Tex. 2018) (quoting *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009)); *see In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130–31 (Tex. 2005). Thus, the ordinary principles of contract law of the forum state determine whether the parties have a valid agreement to arbitrate. *Rubiola*, 334 S.W.3d at 224.

Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatories to the agreement should be compelled to arbitrate their claims. *See Kellogg*, 166 S.W.3d at 738 (collecting cases). The Texas Supreme Court has endeavored to resolve such questions through the application of state law "informed by persuasive and well-reasoned federal precedent," and, in doing so, the court recognizes that it is "important for federal and state law to be as consistent as possible in this area." *Id.* at 739. As such, consistent with federal precedent, the Texas Supreme Court has recognized six theories, that arise from common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel; and (6) third-party beneficiary. *See G. T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 524 (Tex. 2015); *Kellogg*, 166 S.W.3d at 739 (citing *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 356 (5th Cir. 2003)).

B. *Confirmation of the Arbitrator's Award*

The Second Court of Appeals has set forth the following standard for reviewing arbitration awards, with which we agree:

> An arbitration award is conclusive on the parties as to all matters of fact and law submitted to the arbitrator and has the effect of a judgment of a court of last resort. Accordingly, judicial review of an

22

arbitration award is extraordinarily narrow, and we may vacate an arbitration award only in very unusual circumstances.

> To protect the strong deference accorded to arbitration awards, we review a trial court's ruling to vacate or confirm an arbitration award de novo based on the entire record. All reasonable presumptions are indulged in favor of the award, and the challenging party bears the burden to establish an allowable ground for vacatur. We must focus on the integrity of the process, not the propriety of the result.

*Howerton v. Wood*, No. 02-15-00327-CV, 2017 WL 710631, at *3 (Tex. App.—Fort Worth Feb. 23, 2017, no pet.) (mem. op.) (internal citations omitted).

### III. *Analysis*

In their first issue, Appellants contend that the trial court erred when it ordered them to arbitration because no agreement to arbitrate exists between the parties. In support of this contention, Appellants argue that (1) the Second Court of Appeals' decision affirming the denial of their special appearance, which specifically held that the doctrine of direct-benefits estoppel rendered the forum-selection clause in Moreno's ARA enforceable as to Appellants, carries no preclusive effect in this appeal, and (2) direct-benefits estoppel does not apply to them based on this record. Although we agree with Appellants' first point, contrary to Appellants' second assertion, we conclude that direct-benefits estoppel applies here.

### A. *Law of the Case*

The parties' opening sallies concern the applicability of the doctrine of law of the case. Because the Second Court of Appeals' decision, which affirmed the denial of Appellants' special appearance, was based on many of the same facts as well as the same legal principles—that the parties assert are applicable and dispositive here—Appellee urges that we must apply the preclusive effect of the law of the case doctrine to the matter before us.

Under this doctrine, "a court of appeals is ordinarily bound by its initial decision if there is a subsequent appeal in the same case." *Briscoe v. Goodmark*

*Corp.*, 102 S.W.3d 714, 716 (Tex. 2003) (citing *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986)). Law of the case applies when the appellate court is presented with facts that are "substantially the same" as those that existed when the matter was first decided. *See Hudson*, 711 S.W.2d at 630. "The doctrine . . . only applies to questions of law and does not apply to questions of fact." *Id.* Functionally, the doctrine narrows the issues in subsequent stages of the litigation, thus achieving uniformity of decision and judicial economy and efficiency. *Id.* Suffice it to say, the parties to this appeal have yet to subscribe to the principles of judicial economy and efficiency. Nevertheless, a decision rendered on an issue by the appellate court does not absolutely bar the reconsideration of the same issue in a second appeal. *Briscoe*, 102 S.W.3d at 716. Instead, application of the doctrine lies within the discretion of the appellate court, depending on the particular circumstances that are presented in the case before it. *Id.*

The prior stage of litigation, to which the parties refer, only concerns the trial court's exercise of *personal jurisdiction* over Appellants, which they challenged via special appearance. *Deaton*, 2017 WL 4683940, at *3–5. Rule 120a of the Texas Rules of Civil Procedure addresses the procedure for making and contesting a special appearance, and the rule makes clear that the parameters of inquiry—personal jurisdiction—at that stage are only preliminary. *See* TEX. R. CIV. P. 120a. For instance, among other things, the rule sets out what may be considered and form the basis of a trial court's ruling on a special appearance: "[T]he pleadings, any stipulations made by and between parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony." TEX. R. CIV. P. 120a (3); *see In re Christianson Air Conditioning & Plumbing, LLC*, 639 S.W.3d 671, 676–78 (Tex. 2022) (orig. proceeding) (discovery under Rule 120a is limited to information "essential" to the plaintiff's theory of personal jurisdiction). The rule also "recognizes that issues of fact determined in a special appearance may

24

also be relevant to the merits, as it expressly leaves those issues open for redetermination at the merits stage." *Christianson Air Conditioning*, 639 S.W.3d at 677; *see* TEX. R. CIV. P. 120a(2) ("No determination of any issue of fact in connection with the objection to jurisdiction is a determination of the merits of the case or any aspect thereof.").

Thus, Rule 120a specifically limits what the trial court may consider, as well as the extent of the resulting findings, in its jurisdictional inquiry. Although some courts have applied the law of the case doctrine to appeals that involve the reconsideration of a trial court's finding(s) in a special appearance setting, we have not found an example, nor have the parties cited to or directed us to any, that parallels the circumstances before us, in which a court has applied the doctrine in the manner urged by Appellee—that is, to treat the finding(s) from a special appearance ruling, which is clearly a jurisdictional-only determination, as binding in a subsequent determination on the merits. As such, we decline to do so here.[9]

B. *Direct-Benefits Estoppel*

Despite the parties' jurisdictional arguments, the primary thrust of Appellants' complaints on appeal is that direct-benefits estoppel is inapplicable to the circumstances that we must confront in this appeal, and that they therefore cannot be bound by the arbitration clause in Appellee's representation agreement with Moreno. We disagree.

Direct-benefits estoppel is a type of equitable estoppel under which a non-signatory plaintiff who seeks the benefits under a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to

---

[9]*See also Perry Homes*, 258 S.W.3d at 585–86 (rejecting the argument that pre-arbitration mandamus proceedings—in which requests to stay the order compelling arbitration were denied without addressing or commenting on the merits—established the law of the case and precluded the defendants from raising the same arguments when challenging on direct appeal, post-arbitration, the trial court's order to compel arbitration).

arbitrate disputes. *See Kellogg*, 166 S.W.3d at 739 (citing *Bridas*, 345 F.3d at 361–62). Direct-benefits estoppel involves "non-signatories who, during the life of the contract, have *embraced* the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006) (emphasis added) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 200 (3rd Cir. 2001)).

There are two circumstances in which direct-benefits estoppel may apply: "A non-signatory can '*embrace*' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010) (emphasis added) (quoting *Hellenic Inv. Fund*, 464 F.3d at 517–20)); *see Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 533 (Tex. 2023) (holding that even though a home-construction contract that included an arbitration clause was signed by only one spouse, the non-signatory spouse and their children were nonetheless bound by the contract's arbitration clause, and thus were required to arbitrate their construction defect claims, because they sought and obtained direct benefits and "*embraced*" the contract by residing in the home that the signatory spouse purchased); *see also Weekley Homes*, 180 S.W.3d at 131–33. Here, Appellants have not asserted any claims against Moreno or Appellee in this case,[10] therefore they have neither sought to enforce the terms of the ARA nor have they asserted claims that must be determined by reference to it.

---

[10]Although Appellants asserted counterclaims in the arbitration proceeding, our analysis only concerns the applicability of the arbitration clause as to Appellants. The claims that they did assert in the arbitration proceeding do not affect that analysis.

However, and based on our thorough review of the record and the circumstances before us, we conclude that Appellants have *embraced* the ARA by knowingly seeking and obtaining direct benefits from it. Appellants claim that (1) they had a fee-sharing contract with Appellee which did not contain an arbitration clause, (2) this contract defined the parties' relationship, and (3) the ARA and its arbitration clause are entirely superfluous to that relationship. In light of Appellants' arguments, we will first discuss how they sought and obtained direct benefits from the ARA. Next, we will explain how Appellants did so "consistently and knowingly." *Weekley Homes*, 180 S.W.3d at 135; *see Ha*, 660 S.W.3d at 533.

### 1. *Appellants "Sought and Obtained Direct Benefits"*

A party can bind itself to an arbitration provision through its conduct during the life of the contract. *See Weekley Homes*, 180 S.W.3d at 132. For example, the use of a trade name that is pursuant to an agreement that includes an arbitration clause, or the receipt of lower insurance rates and the ability to sail under the French flag because a contract contains an arbitration clause have been found to bind non-signatories to the arbitration provisions in those scenarios because these intangible or abstract benefits were derived directly from agreements that included arbitration provisions. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2nd Cir. 1993) (holding that, under ordinary contract and agency principles, non-signatory Noraudit was estopped from denying its obligation to arbitrate because it knowingly accepted the benefits of the agreement through its continued use of the name "Deloitte") (citing *McCallister Bros. Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2nd Cir. 1980)); *see Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2nd Cir. 1999); *see also Ha*, 660 S.W.3d at 533 ("[R]egardless of whether they asserted contract claims, Mrs. Ha and the children are nevertheless bound to the arbitration provision through direct-benefits estoppel [because] . . . [they] lived in the home at issue. [This] indicates that they accepted

the benefits of Mr. Ha's purchase agreement and therefore may be compelled to arbitrate.").

A non-signatory's conduct in seeking and obtaining direct benefits must be knowing and consistent in order to "embrace" the contract, as opposed to merely "shake[] hands with it." *Weekley Homes*, 180 S.W.3d at 134–35. Because "the equitable nature of the doctrine may render firm standards inappropriate," the doctrine requires "trial courts to exercise some discretion based on the facts of each case." *Id.* at 135 (citing *Bridas*, 345 F.3d at 360). Nevertheless, "when a nonparty consistently and knowingly insists that others treat it as a party [to the contract], it cannot later 'turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.'" *Id.* (quoting *DuPont*, 269 F.3d at 200) (internal citations omitted). Simply put, the North Star and guiding principle for courts to follow in determining whether to apply the doctrine is this: "A nonparty cannot both have his contract and defeat it too." *Id.*

In our view, and based on the record before us, Appellants sought and obtained a direct benefit from the ARAs by actively and continuously expanding their role in the Kugel Mesh litigation beyond that which they and Appellee had contemplated in their fee-sharing agreement. This expansion was not sufficiently accounted for by the revised fee-sharing agreement. Key developments in the litigation and the global settlement that were spurred by Appellants' conduct indicate that—both before and after they became aware of the arbitration provisions contained in the client ARAs—Appellants purposefully sought and occupied a role that exceeded the scope of what their fee-sharing agreement specified. Together, these key developments establish that Appellants sought and obtained direct benefits from the client ARAs by purporting to wield authority on behalf of the clients that their fee-sharing agreement with Appellee did not grant them.

28

The "key" developments referenced above are: Appellants' (1) belief that, through their ongoing efforts, they had so rehabilitated Patton's lawsuit as to have created a high value for that individual case, which in turn influenced the settlement value of all of Appellee's cases; (2) role as lead negotiator during the unsuccessful mediation in the Rhode Island superior court; (3) refusal to cooperate in the establishment of the QSF, which was necessary to consummate any individual client settlements, until Appellants' demands were met; (4) refusal to accept Appellee's decision to terminate them, levying of an attorney's fee lien, and filing motions to segregate $1 million of the QSF funds; (5) execution of the stipulation for nondisclosure of client information, confirming that the ARAs were the source of their authority, and (6) filing motions to disburse the entire $1 million years later, despite their possession of the client ARAs and knowledge that their maximum claim and recovery for attorney's fees as it related to the Kugel Mesh litigation amounted to approximately $400,000.

The first two developments essentially acted to change Appellants' expectations of the case and their perception of their role in it. Whether this change was justified or correct is not relevant to our analysis. It is sufficient to conclude that Appellants expended significant time, effort, and monies into developing the Patton lawsuit and leading the negotiations during the mediation in the Rhode Island superior court. And, to Appellants' understanding, these efforts collectively contributed in a significant way to the overall team effort of reaching a global settlement of Appellee's lawsuits.

Next, Appellants claim that as settlement negotiations neared their successful conclusion, Appellee did not communicate with them in a manner that Appellants considered to be to their satisfaction. Again, the reasonableness of Appellants' perception of these events is not relevant here. Appellants repeatedly requested updates about the status of settlement negotiations and received little or no response.

Then, after the global settlement was reached in principle, Appellants believed that they were not appropriately informed of this development and its implications. Ultimately, Appellants' response to this uncertainty was to advance their position that the settlement could not proceed until their demands and concerns were addressed and met. They refused to sign the QSF stipulation and thus delayed, and potentially jeopardized, the entire global settlement. During this time, Appellants asserted their authority to delay the settlement proceedings because they were the only counsel of record in the Rhode Island state court lawsuits. They also claimed that Appellee's alleged confidentiality concerns were absurd because Appellants had been the lead negotiators during the superior court mediation and were a fee-sharing counsel to those state court lawsuits. They did not address Appellee's expressed concern that they could not meet the confidentiality requirements and definitions in the MSA because they separately represented other Kugel Mesh clients as local counsel in other lawsuits.

When, because of their refusal to facilitate the global settlement, Appellants were terminated as local counsel for nearly all the lawsuits pending in the Rhode Island superior court, Appellants refused to either accept that they had been terminated or were required to withdraw from the lawsuits, despite having received client affidavits confirming their termination in most of the cases. Then Appellants filed a motion, purportedly on behalf of all the same clients, to compel the disclosure of settlement information from Appellee and Bard/Davol, and to segregate an exorbitant amount of the settlement funds for the sole and exclusive purpose of funding, and allowing them to address, their decades-long dispute with Appellee. Though Appellants argue that they intended their "informal" attorney's fee lien to apply only to attorney's fee funds, the actual and unfortunate result of the segregation order affected the distribution of client funds as well.

After they received the client ARAs, the global settlement MSA, and information regarding the QSF funds, Appellants still did not alter their position or seek to reduce the amount of funds in the QSF that were segregated at their request, although it was apparent that the maximum amount of attorney's fees to which they were entitled amounted only to approximately $400,000. Appellants did not disavow the stipulation they signed before receiving the ARAs, which explicitly confirmed that they acted pursuant to the authority granted to them in the ARAs. In fact, in 2020, years after receiving the first ARAs in the summer of 2016 pursuant to the superior court's order, Appellants took affirmative action to obtain the entire $1 million of the segregated funds from the QSF. Their motion to disburse primarily focused on the legal malpractice lawsuit that Patton filed against Appellee, which Appellants had funded to the tune of almost $500,000—funds which Appellants now request be reimbursed to them through the segregated $1 million.

Whether Appellants' actions in all of this were justified, reasonable, or otherwise, does not factor into our analysis of this quagmire. Rather, the question that we must address is whether Appellants knowingly sought and obtained direct benefits from the ARAs. Based on the record before us, we conclude that they did. Like sailing under the French flag, *see Am. Bureau of Shipping*, 170 F.3d at 353, using the well-known tradename "Deloitte," *see Deloitte*, 9 F.3d 1064, or residing in a home that the signatory spouse purchased when the construction contract included an arbitration clause as one of its terms, *see Ha*, 660 S.W.3d at 533, Appellants exercised their authority as counsel for the Kugel Mesh clients to interfere with and affect the entire global settlement in several respects—authority Appellants' sparse fee-sharing agreement could not reasonably confer upon them and ways in which it did not contemplate. Disregarding any confidentiality concerns, whether those were ultimately reasonable or not, Appellants blocked the

31

global settlement for an extended period of time by refusing to sign the QSF stipulation until their concerns and demands were addressed to their satisfaction.

In this instance, Appellants persistent conduct constitutes "*embracing*" the authority granted to them by the ARAs, beyond any level that the fee-sharing agreement could purport to grant. Appellants' concerns about their attorney's fee recovery did not necessitate or authorize them to take the fate of the entire global settlement into their hands—their proffered justifications for doing so, such as concerns about the values of client settlements, had nothing to do with their attorney's fee recovery. Despite this, we note that Appellants later conceded that signing the requested QSF documents would not have resulted in the dismissal of any client lawsuits or affected the individual settlements that had yet to be allocated. The context of their relationship with Appellee, especially concerning Appellants' efforts in the Patton lawsuit, implies that Appellants believed they were unfairly excluded from a process to which they had significantly contributed and developed. This reading of the parties' history is especially vindicated by Appellants protracted and disproportional financial support of Patton's subsequent legal malpractice lawsuit against Appellee and its attorneys. To be sure, we do not necessarily give credence to Appellee's touted confidentiality concerns with respect to its refusal to tender basic settlement information to an attorney and firm with which they had litigated and settled cases for the past six years. However, in seeking to assert their interests, Appellants purposely chose to take actions in their capacity as counsel for the Kugel Mesh clients. Such actions could only have been authorized by the client ARAs, not the fee-sharing agreement.

But Appellants did not stop at thwarting the purpose of the QSF. They refused to either accept their termination as local counsel or withdraw from the pending Kugel Mesh lawsuits. Appellants then filed a motion on behalf of the very clients who had terminated them, without the clients' consent, the result of which was to

segregate a large sum from the general settlement fund for their own, exclusive interests. Finally, years later, when they unquestionably *knew* that their claim for attorney's fees did not, and could not, approach anything close to $1 million, Appellants still sought to extract the entire amount.

Based on this record, we conclude that the facts before us constitute a conscious insistence by Appellants that they be treated as a party to the client ARAs. In this regard, the insistence was knowing and consistent, and it sought and obtained a direct benefit for Appellants from the ARAs—the authority to act on behalf of all the Kugel Mesh clients, independently and even in opposition to Appellee, the clients' primary counsel, in ways that affected all of the clients' settlements, which authority was far beyond and exceeded their designated duties as local counsel.

## 2. *Appellants "Knowingly" Embraced the ARAs*

Importantly, although many of the actions taken by Appellants in seeking and obtaining a direct benefit from the ARAs occurred *before* Appellants became aware of the arbitration provision in the client ARAs, Appellants consistently maintained and reaffirmed their position as the parties' disputes unfolded even *after* they became aware of the arbitration provision and have continued to take affirmative action in furtherance of their positions since that time.

The knowledge element of direct-benefits estoppel has been held by the Second Court of Appeals to require "actual knowledge" or something closely akin to it. *See Telsmith, Inc. v. 37 Building Products, Ltd.*, No. 02-19-00220-CV, 2020 WL 719445, at *4–5 & n.4 (Tex. App.—Fort Worth Feb. 13, 2020, no pet.) (mem. op.) (Holding that direct-benefits estoppel would likely be satisfied if the non-signatory had (1) access to a copy of the arbitration agreement, (2) a summary of its essential terms, or (3) a "similar indicia of knowledge.").

Here, the record shows that Appellants first came into possession of the client ARAs during the summer of 2016, after the issuance of the Rhode Island superior

court's March 11 order that directed Appellee to provide them to Appellants. Prior to this, it is largely undisputed—and the record shows no indication to the contrary—that Appellants had neither seen any client ARAs nor were they otherwise aware of the attendant arbitration provision.

Throughout the Kugel Mesh litigation, the resulting client settlements, and the subsequent attorney's fee dispute, Appellants have asserted a clear position based on authority that emanated exclusively from the client ARAs. When Appellants became aware of the arbitration provision in the ARAs, they did not alter or disclaim any aspect of their position; instead, they continued to pursue aggressive, affirmative action in furtherance of that position, all the while knowing that the basis of their position flowed directly from the ARA's grant of authority, rather than their fee-sharing agreement with Appellee.

Appellants consistently insisted by their conduct that they be treated as a party to the ARAs, even after they came into possession of the ARAs, and therefore *knew* at that time, if not sooner, that the ARAs contained an arbitration clause. With respect to the Rhode Island superior court's rulings, we view Appellants' efforts to avoid arbitration under the ARAs necessarily as attempts by them to repudiate a contract which they knowingly "*embraced*." As such, we conclude that Appellants are bound by the ARA's terms under the doctrine of direct-benefits estoppel.

Because Appellants *knowingly embraced* the terms of the client ARAs, the trial court, in its discretion, correctly (1) applied the equitable doctrine of direct-benefits estoppel to bind Appellants to the terms of the ARAs and (2) ordered them to arbitration pursuant to the ARAs arbitration provision. Therefore, the trial court did not abuse its discretion as Appellants suggest. Accordingly, we overrule Appellants' first issue.

Moreover, because a valid agreement to arbitrate exists between the parties, the arbitrator did not abuse its powers by conducting the arbitration and issuing an

award, and the trial court did not err when it confirmed the arbitrator's award. Accordingly, we also overrule Appellants' second issue.

C. *The Forum Selection Clause of the MSA*

Finally, in their third issue, Appellants contend that "[c]ompelling and conducting arbitration were also error because of a mandatory forum selection clause and an already-pending suit" in the Rhode Island superior court. We disagree. The MSA provides:

> Any dispute arising under this agreement or relating to the subject matter thereof, shall be filed only in the Superior Court of Rhode Island and Settling Claimants, Claimants' Counsel and/or Co-Counsel hereby submit himself, herself, itself, or themselves to the personal jurisdiction of the Superior Court of Rhode Island.

In its October 2020 order denying Appellee's motion to stay Appellants' motion to disburse the QSF funds, the Rhode Island superior court addressed the question of whether direct-benefits estoppel should bind Appellants to the client ARAs and its arbitration provisions. *See All Individual Kugel Mesh Cases*, 2020 WL 6335955, at *4–5. The superior court declined to exercise its discretion to impose this equitable estoppel theory on Appellants and further noted that Appellants had "properly brought [their] motion to disburse here, to this Court, as [Appellee] agreed to do under the master settlement agreement, the stipulation filed as to the master settlement agreement, and the March 11, 2016 order of this Court." *Id.* at *5.

However, the superior court later *granted* Appellee's motion to stay, stating that retaining continuing jurisdiction over the QSF "did not thereby bind all claimants and their attorneys . . . to resolve all disputes underlying the proper calculation of their 'legal fees and costs' through *de novo* hearings or mini-trials before this Court." *All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *15. The United States District Court for the District of Rhode Island described this ruling

to mean that the "litigation of disputes (including those impacting the allocation of attorney's fees and expenses from the QSF) that are governed by the ARA clauses requiring binding arbitration in Texas" are not governed by the forum selection clause in the MSA, which "does not apply to such disputes because [the effect of this clause] is limited 'to any dispute over the substance of the Settlement Agreement.'" *Deaton*, 2023 WL 3158933, at *4 (quoting *All Individual Kugel Mesh Cases*, 2022 WL 19705089, at *15–16 n.11).

Moreover, as previously mentioned, the Rhode Island Supreme Court has issued a stay in the parties' appeal of the superior court's October 2020 denial of Appellee's motion to stay. *Kugel Patch*, 317 A.3d at 783. Noting that a disposition of the matter before us was likely imminent, and that Appellee's prayed-for relief—to stay all proceedings pending the resolution of the Texas arbitrations—in the Rhode Island appeal would thus be rendered moot, the court deemed it prudent to stay its proceedings until the pair of arbitrations conducted in Texas have reached final resolution and all appellate review has been exhausted. *Id.*

It is significant that the dispute before us is not brought under the MSA. Rather, this appeal concerns only whether Appellants are obligated to arbitrate under the terms of the client ARAs. Although the parties' attorney's fee dispute will undoubtedly return to the Rhode Island superior court as they seek the allocation and disbursement of QSF funds, we have no jurisdiction over the resolution of that distinct question. Instead, our opinion today affirms the trial court's order to compel arbitration and its judgment confirming the arbitrator's award of $135,000 to Appellants in quantum meruit damages because Appellants agreed to arbitrate any dispute arising under the client ARAs when they embraced the terms of those agreements. Accordingly, we overrule Appellants' third issue.

36

IV. *This Court's Ruling*

For the reasons stated above, we affirm the judgment of the trial court.

W. STACY TROTTER

JUSTICE

August 21, 2024

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.